## *In re* PEASLEY.

*(Circuit Court, N. D. Illinois.  December 11, 1890.)*

1. PRIVILEGE OF WITNESSES—GRAND JURY—CONSTITUTIONAL LAW.
    Where the testimony of a witness before a grand jury, which is investigating alleged violations of the interstate commerce law by the agent of a railroad company, shows that such witness is not himself guilty of the offense, he cannot refuse to produce certain documents demanded by the grand jury on the ground that their production will tend to criminate him.
2. SAME—INTERSTATE COMMERCE LAW.
    An officer of a railway company doing business between states, when a witness before the grand jury, investigating alleged violations of the interstate commerce law, cannot refuse to produce certain documents demanded by the grand jury, on the ground that their production would tend to criminate the company, as such a company is not liable criminally for violations of the interstate commerce law, nor subject to its penalties and forfeitures.

Petition for Writ of *Habeas Corpus.*

*Mr. Milchrist,* U. S. Dist. Atty., *Mr. Ingham,* and *Mr. Lambertson,* for the United States.

*John Herrick* and *Chester M. Dawes,* for Chicago, B. & Q. R. Co.

*Sidney Smith,* for J. C. Peasley.

GRESHAM, J. The grand jury was engaged in the investigation of alleged violations of the interstate commerce law, by Thomas Miller, general agent of the Chicago, Burlington & Quincy Railroad Company, and on November 26, 1890, James C. Peasley appeared in obedience to a *subpœna duces tecum* commanding him to bring before the grand jury specified papers. After being sworn Peasley answered some questions propounded to him and refused to answer others, and he also refused to produce the papers described in the subpœna. The grand jury thereupon appeared in the district court and submitted the following report:

"*To the Hon. Henry W. Blodgett, Judge of said Court:* The grand jurors in attendance upon said court respectfully report that on the 26th day of November, 1890, they were engaged in investigating and inquiring into certain alleged violations of an act of congress, entitled 'An act to regulate commerce,' approved February 4, 1887, and the amendments thereto, approved March 2, 1889, by Thomas Miller, general agent of the Chicago, Burlington & Quincy Railroad Company, said company being a common carrier, subject to the provisions of said act of congress; that on the said 26th day of November one James C. Peasley, in obedience to a *subpœna duces tecum* theretofore served upon him, commanding him to bring all checks paid to or given to Oliver Gallup or O. D. S. Gallup, or any one by the name of Gallup, at any time during the year last past, by the Chicago, Burlington & Quincy R. R. Company, or any officer thereof, for commissions for services rendered by said Gallup for said company, or for pretended services rendered by said Gallup for said company, or for any other cause, together with the bills rendered by said Gallup for the services or pretended services for which said checks were issued, and the vouchers of said company upon which said checks were issued. In obedience to said subpœna said James C. Peasley appeared before said grand jury, and, being first duly sworn, questions were propounded and submitted to the said witness, and certain answers and certain refusals to answer were made by the said witness, with the grounds for such refusal, touching the matters under investigation, and the papers and documents mentioned in said *subpœna duces tecum,* which questions, answers, and refusals are as follows: '* * * *Question.* What is your business? *Answer.* I am the treasurer of the Chicago, Burlington & Quincy Railroad Company. *Q.* What are your duties as such treasurer? *A.* To supervise, in a general way, the collection of moneys due to the company, and the proper disbursements of those moneys. *Q.* When checks have been given by the company to any one, and those checks have been paid and returned to the company, in whose custody are they then? *A.* I suppose they are in the custody of the company. They are held by Mr. William G. Gordon, the assistant auditor of the company, who checks up the bank pass-book. *Q.* Are such checks under your control and direction? *A.* They are. *Q.* A subpœna has been served on you to produce before this grand jury all checks paid to or given to Oliver Gallup, or O. D. S. Gallup, or any one by the name of Gallup, at any time during the year last past, by the Chicago, Burlington & Quincy Railroad Company, or any officer thereof, for commissions for services rendered by said Gallup for said company, or for pretended services rendered by said Gallup for said company, or for any other cause, together with the bills rendered by said Gallup for the services, or pretended services, for which said checks were issued, and the vouchers of said company, upon which said checks were issued. Have you those documents with you? *A.* I have not. *Q.* Why not? *A.* Because I was advised by counsel not to bring them. *Q.* Do you refuse

to produce those documents before this jury, in obedience to the subpœna? *A.* I do. *Q.* Why? *A.* Because I am advised by counsel that it might tend to criminate myself. *Q.* Do you refuse to produce them for any other reason than that they might tend to criminate yourself? *A.* Well, I decline by advice of counsel. *Q.* Do you base your refusal upon the ground that the production of those papers would tend to criminate yourself? *A.* On the ground that it might tend to criminate myself. *Q.* To whom do those papers belong? *A.* To the Chicago, Burlington & Quincy Railroad Company. *Q.* Had you ever seen the checks described in the subpœna before you were subpœnaed to produce them in court? *A.* No; I have never seen them before or since. *Q.* Had you ever O. K.'d any of the checks or vouchers upon which the checks were issued? *A.* I had not. *Q.* Did you in any wise authorize the giving of the checks, or the making up of the vouchers upon which the checks were issued? *A.* I never gave any authority of any kind in regard to the vouchers. I did authorize by general orders the drawing of checks by our cashier in payment of vouchers properly approved. *Q.* To Mr. Gallup? *A.* No; except under general orders to issue checks to pay approved vouchers. In other words, he was authorized to pay such claims as were presented to him to pay if properly approved. *Q.* Did you yourself have any knowledge of the consideration for which these checks were given, or of the transaction out of which they grew? *A.* I did not. *Q.* Did you know prior to the time a subpœna was served upon you to produce these documents that said documents were in existence? *A.* I did not. *Q.* What officer in your company now has the documents mentioned in the subpœna in his possession? *A.* That is a pretty broad question. It is one I could not answer fully. It is beyond my power. Checks, as I have explained, are in the custody of the assistant auditor, who checks them over. *Q.* Do you know where the documents mentioned in the subpœna now are? *A.* I do not. *Q.* Have you given orders or directions to any person not to produce the documents mentioned in the subpœna? *A.* Yes; I have. *Q.* To whom did you give those orders? *A.* To Mr. Fabian, who is the cashier, and to Mr. Gordon, who is the assistant auditor. *Q.* When did you give those orders? *A.* To Mr. Gordon this morning, and to Mr. Fabian one day last week. I don't remember the day. *Q.* Were the orders to Mr. Fabian delivered by you after the service of this present subpœna upon you, or the orders to Mr. Fabian given after the first subpœna upon you? *A.* Yes; they were. *Q.* Did you give those orders to the gentlemen whom you have mentioned for the purpose of preventing them from producing those documents before the grand jury? *A.* I did, and by advice of counsel. *Q.* Upon what ground did you give such orders? *A.* That the papers might tend to criminate them and to criminate me. *Q.* Your refusal to produce the checks, papers, and documents referred to in the subpœna is based solely upon the ground that the production of the same might tend to criminate yourself? *A.* I wish to add that whatever papers and books of the Chicago, Burlington & Quincy Railroad Company are in my custody and control are so only in my custody as an agent and employe of the company. I have no authority from the company to produce any such books or papers before the grand jury, or to furnish them for inspection by the grand jury. I decline to produce the books and papers described in the subpœna for the reason aforesaid, and because the production thereof would tend to criminate the Chicago, Burlington & Quincy Railroad Company, and would subject it to penalties and forfeitures. *Q.* If those checks and other documents mentioned in the subpœna are in existence, can you produce them if ordered to do so by the court? *A.* I can.' The grand jury further report and say: That prior to the appearance before it of the said James C. Peasley, as a witness, testimony had been heard by said grand jury tending to show that certain checks had been given and paid to one O. D. S. Gallup, by certain

officers and agents of said Chicago, Burlington & Quincy Railroad Company, on behalf of said company, and that said checks were ostensibly given in payment of pretended services, but that in fact they were given as a rebate, refund, or drawback on grain transported from points in other states to the city of Chicago, in the state of Illinois, whereby the consignees of such grain were enabled to obtain a less rate than the rate established by said company, which said payments, rebates, drawbacks, and commissions were paid under an arrangement and agreement with the said Thomas Miller, general freight agent of the said Chicago, Burlington & Quincy Railroad Company, and pursuant to his orders, and on vouchers certified by him.

"JOHN W. CHERRY, Foreman."

Peasley was ruled to show cause why he should not answer the questions he had refused to answer, and produce the papers and documents he had refused to produce, and, failing to do so to the satisfaction of the court, it was ordered that he appear before the grand jury without delay, and make answer to the unanswered questions, and produce the papers set forth in the report. He appeared before the grand jury in obedience to this order, and, upon being interrogated as before, again refused to answer the questions, and he also refused to produce the papers before demanded, for the reasons that his answers to the questions would tend to criminate him, and that the production of the papers and documents would also tend to criminate him, and subject the Chicago, Burlington & Quincy Railroad Company, of which he was an agent, to penalties and forfeitures. The grand jury again appeared in open court, and submitted another report, informing the court that Peasley still refused to answer the questions and deliver the papers demanded, and, being present in person and by counsel, and persisting in his refusal, he was adjudged to be in contempt, fined in the sum of $500, and ordered into the custody of the marshal, to be held until he paid the fine, answered the questions, and produced the papers. After Peasley had been taken into custody, he presented his petition, reciting the foregoing facts, and praying that a writ of *habeas corpus* be issued, directed to the marshal, requiring him to bring the petitioner before the court, and that upon a proper hearing he be discharged. The petition averred that the fourth and fifth amendments to the constitution of the United States justified the attitude of the petitioner before the grand jury and the district court, and that the action of both was without jurisdiction and void.

It appears from the first report of the grand jury that Peasley's examination was limited to a criminal charge against Miller. Evidence had already been obtained tending to show that Miller had violated the statute, and it was deemed necessary that the grand jury should see the papers which Peasley was asked to produce. He testified that while, by general orders, he had authorized the payment of checks on vouchers properly approved, he had never seen or approved the papers described in the subpœna; that he had no knowledge of the consideration for which the Gallup checks were given, or of the transactions out of which they grew; that he did not even know of the existence of the checks or papers when he was served with the subpœna requiring him to produce them; that after he heard of their existence, he ordered the officers in whose

custody they were to hold them, and not produce them before the grand jury; that he had no authority from the company to produce the papers called for, or any others, and that he declined to produce them for the reason that their production would tend to criminate him and the company, and subject it to penalties and forfeitures. Peasley's testimony shows that he was not guilty of the offense which the grand jury was investigating, and therefore the production of the papers demanded would not criminate him. He needed no privilege, and his refusal to produce the papers was unauthorized. If, however, the showing which he made before the grand jury had been different, and it had appeared that the production of the papers might criminate him, then, for the reasons given in the *Counselman Case, ante*, ——, he could not claim immunity under the fourth and fifth amendments. If a witness cannot claim the privilege for the benefit of himself, he cannot claim it for the benefit of another, and Peasley's refusal to produce the checks and vouchers, because their production would tend to criminate the company, of which he is an officer, is based upon nothing in the interstate commerce law or the constitution. Corporations acting as common carriers between states are not liable criminally for violations of the interstate commerce act, nor are they exposed to its penalties and forfeitures. For some reason, satisfactory to congress, only the officers of such corporations and shippers may be punished for violating the statute.

It follows that the order of the district court, adjudging Peasley in contempt, and that he be fined and imprisoned, was authorized, and he will remain in the custody of the marshal.