## *In re* MOSER.

1. WITNESSES—PRIVILEGE—SELF-CRIMINATING EVIDENCE.
   The protection against self-incrimination afforded by the State and Federal Constitutions is personal to the witness, and cannot be used by him for the protection of others, no matter how closely associated they are with him.

2. SAME — INCRIMINATING TENDENCY OF TESTIMONY — DETERMINA-
TION OF QUESTION.

> The witness himself is not the sole judge of whether his testi-
> mony will tend to incriminate himself, but he must answer a
> question put to him unless the answer may actually tend to
> criminate him.   Where it is perfectly apparent that the an-
> swer cannot injure him the court should compel him to
> answer.

3. SAME—CORPORATE OFFICERS—PRODUCTION OF BOOKS.

> The president of a corporation, subpœnaed to testify before the
> grand jury, which was investigating charges of corruption
> against municipal officers in connection with a contract be-
> tween the city and the corporation, could not refuse to pro-
> duce the books of the corporation, by invoking the provisions
> of the State and Federal Constitutions protecting witnesses
> from self-incrimination, where he himself was not connected
> with the corporation at the time covered by the investigation,
> and was in no way connected with or interested in the con-
> tract under investigation, and had no personal knowledge of
> the entries which were being investigated, so that nothing
> contained in the books could in any way incriminate him.
> MOORE, C. J., dissenting.

4. SEARCHES AND SEIZURES — CORPORATE BOOKS — COMPELLING
PRODUCTION.

> One cannot be compelled to produce his own books, or the
> books of another which are under his control, where their
> production would tend to criminate him, nor can his clerk be
> required to produce them; but when, as the agent of a cor-
> poration, he makes entries on the corporate books, and those
> books are in the actual and legal possession and control of
> another officer of the corporation, or of the corporation itself,
> such officer may be compelled to produce them, in a proper
> case, under a subpœna duces tecum, and such compulsion
> does not amount to an unjustifiable search and seizure, with-
> in the prohibition of the Constitution.

Certiorari to Saginaw; Beach, J.   Submitted Novem-
ber 20, 1903.   (Docket No. 239.)   Decided December 7,
1904.

Augustus G. Moser was convicted of contempt in refus-
ing to produce certain books of account before a grand
jury.   Affirmed.

The petitioner was convicted of contempt of court, in refusing to produce before the grand jury, in obedience to a subpœna duces tecum, certain books of account of the Bartlett Illuminating Company. The case is before us for review on certiorari. The defenses now urged are (1) that the entries might tend to criminate the petitioner; (2) that, as the avowed purpose in demanding the books was to obtain evidence against other officers of the Bartlett Illuminating Company, compulsory process for their production was in violation of section 26, art. 6, of the Constitution of Michigan, and of the fifth amendment of the Constitution of the United States.

The material findings of the court are:

"1. That on the 9th day of April, 1903, and for some days prior, said grand jury were engaged in investigating and inquiring into certain alleged violations of the provisions of section 11312 of the Complied Laws of 1897, which said section makes it a felony for certain municipal officers to corruptly accept any gift or gratuity, or any promise to make any gift or to do any act beneficial to such officer, under an agreement or with an understanding that his vote, opinion, or judgment shall be given in any particular manner or upon a particular side of any question which is or may be by law brought before him in his official capacity.

"2. That said books and records referred to in said subpœna contain material and necessary evidence to aid said grand jury in making an investigation, in determining whether said section of the statute had been violated.

"3. That said respondent on said 9th day of April, 1903, was the president of said company; was in possession and had full control of the books and records described in said subpœna; that it was within his power and ability, if he so desired, to produce to said grand jury the books and records called for by said subpœna.

"4. That said respondent on said 9th day of April appeared before said grand jury and refused to produce the books and records called for by said subpœna, and further refused and declined to produce any one of said books and records to said grand jury as commanded by said subpœna.

"5. The respondent's refusal to produce said books to said grand jury for the year 1900, and from January 1 to

July 22, 1901, was not for the reason that the entries contained in said books or records would tend to criminate him, and he repeatedly stated to said grand jury that the books and records called for by said subpœna, from January 1, 1900, to July 22, 1901, could in no way tend to criminate him.

" 6. That said respondent's refusal to produce the books and records called for by said subpœna for the year 1900, and from January 1 to July 22, 1901, was a violation of section 1098 of the Complied Laws of 1897.

"7. That the production of the books of the Bartlett Illuminating Company for the year 1900 and the year 1901, containing the accounts up to the 22d day of July of that year, could in no way tend to criminate the respondent, and that he should produce to this court, before said grand jury, the books and records called for in said subpœna, from January 1, 1900, to July 22, 1901.

"8. That the respondent was in no way connected with or interested in said municipal contract; that in fact he was not in this State at the time, nor interested or connected with said company until nearly a year after said matter was closed, and that no bill is pending before said grand jury against him; and that said jury is not considering any matter in which he is personally interested."

*Weadock & Purcell* and *James H. Davitt*, for petitioner.

*John F. O'Keefe*, Prosecuting Attorney, for the people.

GRANT, J. *(after stating the facts)*. Under the Constitutions of Michigan and the United States, no witness can be compelled to give testimony which might tend to criminate himself or expose him to a criminal prosecution. The provision in each Constitution is the same. Many cases have arisen in the courts, both of the States and of the United States, under this provision. The only difficulty has been in determining whether the facts of each case bring the party under the protection afforded him by the Constitution.

The shield afforded is personal to the witness, designed for his own protection, and not for the protection of others.

138 MICH.—20.

The witness himself is not the sole judge of whether an answer to a question will tend to criminate himself. The due administration of the law does not permit him to arbitrarily hide behind a fancied or intangible danger to himself. It gives him no right to attempt to avert real danger from others, no matter how closely he may be associated with them. Unless the answer to the question may tend to criminate himself, he must answer, whatever the consequence may be to others; otherwise the administration of justice would be seriously obstructed.

The position on behalf of the petitioner appears to be that the witness himself is the sole judge, and that, when he says the answer may tend to criminate him, the controversy is closed. The Constitution vests in the witness no such arbitrary power, and we are cited to no decision which goes to that extent.

Counsel for petitioner cite and rely upon *People, ex rel. Taylor*, v. *Forbes*, 143 N. Y. 219, and *Adams* v. *Lloyd*, 3 Hulst. & Nor. 351. The language of those cases extends the right of the witness to protect himself as far as any which I have examined. In *Adams* v. *Lloyd* it is said:

"Where the judge is perfectly certain that the witness is trifling with the authority of the court, and availing himself of the rule of law to keep back the truth, having in reality no ground whatever for claiming the privilege, then the judge is right in insisting on his answering the question."

In *People, ex rel. Taylor*, v. *Forbes* the testimony of the witness and the facts elicited clearly showed that the replies to the questions put might naturally tend to criminate the witness. In that case the court say:

"The weight of authority seems to be in favor of the rule that the witness may be compelled to answer when he contumaciously refuses, or when it is perfectly clear and plain that he is mistaken, and that the answer cannot possibly injure him, or tend in any degree to subject him to the peril of prosecution. * * * Where it is not so perfectly evident and manifest that the answer called for

cannot incriminate, as to preclude all reasonable doubt or fair argument, the privilege must be recognized and protected."

In *Ex parte Senior*, 37 Fla. 1, it is said:

"It has never been recognized that he [the witness] alone has the right in all cases to decide whether his answer will tend to criminate him. Such a rule would be mischievous and enable unscrupulous witnesses to defeat the ends of justice."

In the recent case of *Ex parte Irvine*, 74 Fed. 954, it is said:

"The true rule is that it is for the judge before whom the question arises to decide whether an answer to the question put may reasonably have a tendency to criminate the witness, or to furnish proof of a link in the chain of evidence necessary to convict him of a crime. * * * It must appear to the court, from the character of the question, and the other facts adduced in the case, that there is some tangible and substantial probability that the answer of the witness may help to convict him of a crime."

Considering the importance of the question, I deem it proper though this opinion may be long, to here quote the language of Chief Justice Marshall in *Burr's Trial* [Fed. Cas. No. 14,692 *e*]:

"It is a settled maxim of law that no man is bound to criminate himself. This maxim forms one exception to the general rule which declares that every person is compellable to bear testimony in a court of justice. For the witness who considers himself as being within this exception, it is alleged that he is, and from the nature of things must be, the sole judge of the effect of his answer; that he is consequently at liberty to refuse to answer any question if he will say, upon his oath, that his answer to that question might criminate himself.

"When this opinion was first suggested, the court conceived the principle laid down at the bar to be too broad, and therefore required that authorities in support of it might be adduced. Authorities have been adduced, and have been considered. In all of them the court could perceive that an answer to the question propounded might criminate the witness, and he was informed that he was

at liberty to refuse an answer. These cases do not appear to the court to support the principle laid down by the counsel for the witness, in the full latitude in which they have stated it. There is no distinction which takes from the court the right to consider and decide whether any direct answer to the particular question propounded could be reasonably supposed to affect the witness. There may be questions, no direct answer to which could in any degree affect him; and there is no case which goes so far as to say that he is not bound to answer such questions. The *Case of Goosely* [Fed. Cas. No. 15,230], in this court, is perhaps the strongest that has been adduced. But the general doctrine of the judge in that case must have referred to the circumstances which showed that the answer might criminate him.

" When two principles come in conflict with each other, the court must give them both a reasonable construction, so as to preserve them both to a reasonable extent. The principle which entitles the United States to the testimony of every citizen, and the principle by which every witness is privileged not to accuse himself, can neither of them be entirely disregarded. They are believed both to be preserved to a reasonable extent, and according to the true intention of the rule, and of the exception to that rule, by observing that course which, it is conceived, courts have generally observed. It is this: When a question is propounded, it belongs to the court to consider and to decide whether any direct answer to it can implicate the witness. If this be decided in the negative, then he may answer it without violating the privilege which is secured to him by law. If a direct answer to it *may* criminate himself, then he must be the sole judge what his answer would be. The court cannot participate with him in this judgment, because they cannot decide on the effect of his answer without knowing what it would be; and a disclosure of that fact to the judges would strip him of the privilege which the law allows, and which he claims. It follows necessarily, then, from this statement of things, that if the question be of such a description that an answer to it may or may not criminate the witness, according to the purport of that answer, it must rest with himself, who alone can tell what it would be, to answer the question or not. If, in such a case, he say upon his oath that his answer would criminate himself, the court can demand no other testimony of the fact.   *   *   *

"The gentlemen of the bar will understand the rule laid down by the court to be this: It is the province of the court to judge whether any direct answer to the question which may be proposed will furnish evidence against the witness. If such answer *may* disclose a fact which forms a necessary and essential link in the chain of testimony, which would be sufficient to convict him of any crime, he is not bound to answer it so as to furnish matter for that conviction. In such a case the witness must himself judge what his answer will be, and if he say, on oath, that he cannot answer without accusing himself, he cannot be compelled to answer." 1 *Burr's Trial,* 243.

Other cases might be cited, but these we deem sufficient. It follows that, if the facts are as stated in the finding of the court, the petitioner was properly convicted of contempt. The question was determined by the court below upon the testimony of the petitioner, given before the grand jury. From that it is established that, during the time in which the books sought and ordered to be produced were kept, and the entries therein made, the petitioner had no connection whatever with, and no interest in any form in, the Bartlett Illuminating Company, or any of its officers. He did not during that time live in this State, but lived in Little Rock, Ark. He testified that he knew nothing about those entries personally, and had no part in making them. He testified as follows:

"I was not here during the letting of the contract by the city to the Bartlett Illuminating Company for lighting. I had no connection whatever with that matter. That was long before I came here. I was not in the city at that time. * * * I had nothing to do with the books in 1900. I don't think there is anything in these books that would tend to criminate me in 1900. * * *

"*Q.* Does the customers' ledger contain anything for the year 1900 that might tend to criminate you? * * * *A.* Personally; no, sir.

"*Q.* You decline to produce the customers' ledger for 1900? *A.* Yes, sir.

"*Q.* Not because it would tend to criminate you; that's not the reason you decline to do it? *A.* Not the books for 1900; no, sir.

" *Q.* There is nothing in the books of 1900 that would tend to criminate you ? *A.* No, sir."

He further testified that he refused to produce the books under the advice of his attorneys.

"They have advised me not to produce any of the books. They said I shouldn't do it, because I didn't have to do it."

He nowhere testified that his attorney advised him that there was anything in the books during the time covered that could in any way tend to criminate him. In one part of his examination, after testifying that he did not see how the production of the books during that time could in any way criminate him, he said:

"I decline to answer these questions on the ground our attorney says. 'We don't have to.' That is the sole reason I decline to produce them."

Again he testified that he did not decline to produce them for the year 1900 because they would tend to criminate him, for he said they would not, but he declined to produce them on the advice of his attorney. These statements are reiterated several times during his examination. The only basis furnished in his testimony which could be construed as protecting him is this:

" *Q.* The only question is this: Whether or not you decline to produce those books before this grand jury because there is evidence in the books that would tend to criminate you; that is what we want to know; and whether that is the reason why you decline to produce the books ? *A.* I decline to answer the question on the ground it might have a tendency to criminate me.
" *Q.* The production of the books? *A.* Yes, sir.
" *Q.* You think, then, there is some evidence in those books, that, if it should come to the light of this grand jury, might tend to criminate you ? *A.* I decline to answer.
" *Q.* You decline to answer that question ? *A.* Please state the question again.
" (Question read.) *A.* It might."

This testimony is followed by the statement again that he had no connection whatever with the letting of the con-

tract which the grand jury were investigating; that it was long before he came there; that he had nothing to do with the Saginaw business then, and knew nothing about it. It is then asked why there was evidence in the books which might tend to criminate him, to which he replied:

"There may be some little things that would come up from time to time, where I might have given a few things away, perhaps—lamps or things of that kind—that might have a tendency to criminate me, although there is nothing in it; absolutely nothing."

From this evidence, I think it manifest that he only based his claim for the privilege upon the entries made upon the books after he became the president of the company, and not that there was anything in the former entries which could by any possibility tend to criminate him. I think it apparent that the sole basis for the petitioner's refusing to produce the books was his desire to protect the officers of the corporation during the time under investigation, and those with whom they dealt as officers of the municipality.

*In re Peasley*, 44 Fed. 271, is very similar in its facts to this case, and the Federal court (Judge Gresham presiding) held the witness guilty of contempt.

In *Brown* v. *Walker*, 161 U. S. 591, it was held that the Federal act of 1893 shielded the witness from criminal prosecution in consequence of his testimony. The court, however, recognized the rule applicable here, in holding that the witness could not refuse to testify against his fellow officers, saying:

"It would be to convert a salutary protection into a means of abuse if it were to be held that a mere imaginary possibility of danger, however remote and improbable, was sufficient to justify the withholding of evidence essential to the ends of justice."

See, also, *U. S. Express Co.* v. *Henderson*, 69 Iowa, 40.

2. Does the production of these books under the order of the court amount to unjustifiable search and seizure prohibited by the Constitution? The learned counsel for

the petitioner state their position upon this point as follows:

" There is no difference in principle between the forcibly seizing and carrying away of such books by the sheriff or other court officer, and the compulsory production of them on a subpœna duces tecum.  If the officers of this company, whom the people are seeking to indict, have any rights in the information contained in those books, or in the books themselves, which would enable them to resist the sheriff if he sought to take the books away by force, then obedience to a subpœna duces tecum cannot be compelled unless the law will sanction an attempt to do by indirection what it would be unlawful to do directly.    *    *    *
"And therefore we contend that, even if there was nothing in these books which would involve Mr. Moser in a criminal charge, still he was right in his refusal to produce them if they contained evidence of the guilt of other officers and members of the corporation—persons who, if actually present, would have a right to take them and keep them for their own protection, as against all the powers of the prosecution."

The difference between seizing record books and documents of another upon a search warrant, and the production of the same upon a subpœna duces tecum, is apparent. In the former the owner is absolutely deprived of all possession and control thereof, and they and their contents are subject to the gaze and examination of others.   In the latter the records and documents are not taken from the possession of the owner.   They are produced in court by him in his possession, and only such matters therein as pertain to the issue involved can be subject to the examination of the proper officers of the court.·  The production of books and papers for inspection and use in suits, both civil and criminal, is as old as the law itself.   Whether the production is by search warrant or by a subpœna duces tecum, the necessity therefor must be shown to the court, and the particular documents or records required sufficiently specified in the application; and, in either process, courts will permit only the examination of such parts thereof as relate to the issue before the court.   The pro-

cess for search and seizure is the one usually resorted to to determine whether property stolen or unlawfully seized is in the possession of another. The usual process to secure evidence from records and documents is by subpœna duces tecum, and no case is cited where an attempt has been made to proceed by search warrant. No private individual can be compelled to produce his books or papers for the purpose of affording evidence against himself in a criminal prosecution. Neither can the subterfuge of subpœnaing his clerk, who has access to or temporary possession of the books for the purpose of his employer's business, be resorted to, to compel a production of the books. The possession of the clerk in such case is the possession of his employer. The books of a corporation are not the private property or books of petitioner or any other officer of the company. The corporation is a distinct entity. *Randall* v. *Dudley*, 111 Mich. 437; *Rough* v. *Breitung*, 117 Mich. 48, and authorities there cited.

The petitioner asserts that the conduct of his predecessor, the former president of the corporation, is under investigation by the grand jury. Mr. Moser testified that he, as president, had possession and control of the books required. They are not in his possession as owner thereof, but as an officer of the company. The former president presumably was entitled to the control in the same manner as is Mr. Moser, but when he ceased to be president he ceased to be entitled to the actual possession or control of the books, and the right of actual possession became vested in Mr. Moser, as president. If the former president made or caused to be made entries upon the books of his principal which tend to convict him of crime, neither the corporation itself, which is not subject to a penalty, nor any agent thereof who has the actual and legal possession of the books, can refuse to produce such entries.

The question was not involved in *Boyd* v. *U. S.*, 116 U. S. 616. The court characterized the proceeding in that case as "an attempt to extort from the party his private books and papers to make him liable for a penalty, or

to forfeit his property." It was equivalent to compelling him to produce evidence of his own criminality. It did not involve entries which he had made in books belonging to another.

In *Re Peasley*, 44 Fed. 271, the grand jury were investigating certain alleged violations of the interstate commerce law by the general agent of a railroad company. Mr. Peasley was its treasurer, and had control and possession of the documents sought to be produced before the grand jury. He was held guilty of contempt for refusing to produce them. That case seems to be the parallel of this.

In *Brown* v. *Walker*, 161 U. S. 591, the auditor of a railroad company was asked whether it had transported coal at a lower rate than those established between terminal points, and whether any rebate, refund, or commission had been paid by the company, and to state the amount, if any. He was held guilty of contempt in declining to answer. If the books had contained entries of such rebates and illegal rates, in the handwriting of the officer of the company whose conduct was under investigation, or made by his authority, and the auditor had control or possession of the books, could he refuse on the ground of an unjustifiable search and seizure? There would be no seizure of the officer's books or papers. Neither would there be any seizure of the corporation's books or papers. The officer in whose possession they are would produce them in court, still in his possession, and show the entries required, if there were any.

In *U. S. Express Co.* v. *Henderson*, 69 Iowa, 40, the agent of an express company was subpœnaed to produce the books of the corporation, for the purpose of showing that the company had transgressed the law. The refusal to produce was based upon the identity of the witness with his employer, and this was held insufficient.

We think the rule is this: One cannot be compelled to produce his own books, or the books of another, which are under his control as agent or otherwise, where their

production would tend to criminate him; neither can his clerk, whose possession is his possession, be required to produce them; but when, as the agent of another, he chooses to make entries on the books of that other, and those books are in the actual and legal possession and control of another officer of the corporation, or of the corporation itself, such officer may be compelled to produce them, in a proper case, under a subpœna duces tecum.

The unreported case of *Frazer* v. *Circuit Judge* does not apply here. In that case the officers of the Detroit City Railway Company, in whose possession and control the books were, and who were under investigation by the grand jury, were ordered by a subpœna duces tecum to produce the books. It requires no argument to show that they were thus required to produce testimony against themselves and were therefore within the protection of the Constitution. In that case the circuit judge found "that Robert J. Mc-Kenny, the person against whom the order for the production of said books and papers is sought, is but an employé of the said Detroit City Railway Company, as one of its bookkeepers, and has no control over said books and papers independent of the officers of said corporation, and has access to them and uses them simply in a clerical capacity; said books being under the actual and legal control of the officers of said company at the office of said company."

The order of the court below is affirmed.

CARPENTER, MONTGOMERY, and HOOKER, JJ., concurred with GRANT, J.

MOORE, C. J. (*dissenting*). A grand jury was convened in Saginaw county. It was charged by the circuit judge to investigate the conduct of parties connected with certain municipal contracts. While pursuing the investigation, Augustus G. Moser was examined as a witness before the grand jury. By a subpœna he was commanded to bring certain books of the Bartlett Illuminating Company, a corporation of which he has been president

since July 24, 1901. Mr. Moser appeared before the grand jury, but refused to produce the books. This action was reported to the circuit judge, who, after a hearing, made an order that Mr. Moser produce all original books of the Bartlett Illuminating Company for the year 1900, and all the books for the year 1901, to and including the 22d day of July, 1901, called for by said subpœna, and, in case respondent is not able to seal said books of the year 1901 so as not to disclose the entries made therein on and after the 22d day of July, 1901, that then he produce a copy or transcript of all entries of January 1, 1901, to July 22, 1901; that said books be produced before said grand jury at the court-house in the city of Saginaw on or before the 29th day of April, 1903, at 9:30 o'clock in the forenoon of said day, and, in default thereof, that he stand committed to the common jail of the county. The case is brought here by certiorari to review the action of the circuit judge.

It is insisted the relator was under no obligations to produce the books, for two reasons: *First*, that the entries might tend to criminate him; and, *second*, that, as the avowed purpose of the people in demanding them was to obtain evidence against his fellow officers and directors of the Bartlett Illuminating Company, compulsory process for their production was in violation of section 26 of article 6 of the Constitution of Michigan, and of the fifth amendment of the Constitution of the United States.

The circuit judge was of the opinion that the production of such portion of the books as his order required Mr. Moser to produce would not tend to criminate him. This opinion is based upon the following testimony of Mr. Moser:

"I don't see how it [the books] would have a tendency to criminate me, because I wasn't here at that time. * * * I decline to produce the books on the advice of our attorneys. * * * I don't know whether the production of the books would tend to criminate me or not. * * * I have been connected with the Bartlett Illuminating

Company since July 23, 1901, as president of the company. I was not here during the letting of the contract by the city to the Bartlett Illuminating Company for lighting. I had no connection whatever with that matter. That was long before I came here. I was not in the city at that time. * * * I had nothing to do with the books in 1900. I don't think there is anything in these books that would tend to criminate me in 1900. * * *

"Q. Does the customers' ledger contain anything for the year 1900 that might tend to criminate you? * * * A. Personally; no, sir.

" Q. You decline to produce the customers' ledger for 1900? A. Yes, sir.

" Q. Not because it would tend to criminate you; that's not the reason you decline to do it? A. Not the books for 1900; no, sir.

" Q. There is nothing in the books of 1900 that would tend to criminate you? A. No, sir."

Counsel for petitioner insist this testimony should be read in connection with the following testimony of Mr. Moser, and, when so read, brings him within the rule that he shall not be compelled to produce testimony which may tend to criminate him:

" Q. Why? A. As I stated awhile ago, on the advice of our attorneys.

" Q. Do you decline to produce those books to this grand jury for the reason that the production of those books would tend to criminate you? A. I decline to produce the books on the advice of my attorneys. Yes, sir.

" (Question read.) A. It might have a tendency to criminate me.

" Q. You say, then, Mr. Moser, that the production of those books—the entries that they contain—might have a tendency to criminate you, and that is the reason why you declined to produce them? A. Well, I don't see how it would have a tendency to criminate me, because I wasn't here at that time.

"Q. What this grand jury wants to know is whether or not there is evidence in those books that, if produced, would tend to criminate you, and that is the reason why you decline to produce those books before this grand jury. A. No, sir; I decline to produce the books on the advice of our attorneys.

"*Q.* You don't decline to produce the books because the production of the books would tend to criminate you ? *A.* Why, I don't know whether the production of the books would criminate me or not.

"*Q.* The only question is this: Whether or not you decline to produce those books before this grand jury because there is evidence in the books that would tend to criminate you; that is what we want to know; and whether that is the reason why you decline to produce the books ? *A.* I decline to answer the question on the ground it might have a tendency to criminate me.

"*Q.* The production of the books ? *A.* Yes, sir.

"*Q.* You think, then, there is some evidence in those books, that, if it should come to the light of this grand jury, might tend to criminate you ? *A.* I decline to answer.

"*Q.* You decline to answer that question ? *A.* Please state the question again.

"(Question read.) *A.* It might.

"*Q.* You mean that, do you ? *A.* Yes, sir. I have been connected with the Bartlett Illuminating Company since July 23, 1901, as president of the company. I was not here during the letting of the contract by the city to the Bartlett Illuminating Company for lighting. I had no connection whatever with that matter. That was long before I came here. I was not in the city at that time. I did not know Mr. Hermann. Did not know Mr. Bonta at that time, only by reputation. He was connected with the same company I was, but I hadn't met him at that time. I had nothing to do with the business in Saginaw then, and knew nothing about it. There has been nothing crooked going on, to my knowledge, since this contract was let to the Bartlett Illuminating Company. I have not done anything that is crooked.

"*Q.* Why, then, is there evidence in those books that will tend to criminate you ? *A.* Well, there may be some little things that would come up from time to time, where I might have given a few things away, perhaps—lamps or things of that kind—that might have a tendency to criminate me. Although there is nothing in it; absolutely nothing.

"*Q.* Have you been giving away lamps—to aldermen, you mean? *A.* I decline to answer that question.

"*Q.* Because it would have a tendency to criminate you? *A.* It might have a tendency to criminate me.

" *Q.* Have you given lamps to any one else, except aldermen? *A.* Certainly; yes, sir.

" *Q.* Now, what else have you done that is criminating? *A.* I don't think I have done anything that is criminating.

" *Q.* You say these books contain evidence that might tend to criminate you? *A.* Well, it might in some way. I don't know exactly. But I am not going to take any chances.

" *Q.* You think you have been doing something that is crooked? *A.* No, sir, I don't think so. This is not simply bluff I am putting up to keep this grand jury from seeing these books. I had nothing to do with the books in 1900. I don't think there is anything in these books that would tend to criminate me in 1900. I refuse to produce these books before this grand jury under the advice of our attorneys, Weadock and Davitt. They have advised me not to produce any of the books. They said I shouldn't do it, because I didn't have to do it. I came here in 1901, in July. Up to July there is nothing in those books in which I am in any way interested personally, of the customers' ledgers. There are entries in the meter books for the years 1900, 1901, and 1902, in which I am interested personally.

"*Q.* Do those books contain a record of anything you gave away at that time? *A.* I decline to answer that question.

"*Q.* Because it would tend to criminate you? *A.* Might have a tendency to criminate me.

"*Q.* Does the customers' ledger contain anything for the year 1900 that might tend to criminate you, or in which you are in any way interested? *A.* It might.

"*Q.* For 1900, before you came here? *A.* You said in any way interested. I understood?

"*Q.* Well, anything that would tend to criminate you? *A.* Personally?

"*Q.* Yes, personally? *A.* No, sir.

"*Q.* You decline to produce the customers' ledger for 1900? *A.* Yes, sir.

" *Q.* Not because it would tend to criminate you; that is not the reason you decline to do it? *A.* Not the books for 1900; no, sir.

" *Q.* There is nothing in the books of 1900 that would tend to criminate you? *A.* No, sir.

" *Q.* Got a cashbook for the year 1900? *A.* Yes, sir.

" *Q.* Anything in that book for the year 1900 that

would tend to criminate you? *A.* I don't think so. There is nothing in the books of 1900 that will criminate me—I don't think in any book. I decline to produce the cashbook for 1900.

" *Q.* You don't decline to produce the books for the year 1900 because they might in any way tend to criminate you personally? *A.* I decline to produce the books on the advice of my attorney.

" *Q.* And that is the only reason you decline to produce them? *A.* And there might be things appear in there that might have a tendency to criminate me in some way. I don't know. I don't propose to take any chances on them. I don't know of a thing criminal, or that might tend to be criminal, that I did in 1900, in connection with the business of the Bartlett Illuminating Company. Mr. Weadock was the one, mainly, who advised me not to produce these books. I first talked with him about it perhaps last week, or week before last—since this grand jury has been called. I don't remember whether or not I told Mr. Weadock what was in the books. I don't know that I told him what books they were. (Witness is here given the instructions by prosecuting attorney that he is not obliged to answer any question that might tend to criminate him, and that if he commits perjury an indictment might be found against him by the grand jury.) I don't believe I can say how many customers' ledgers there are for the year 1900.

"*Q.* The books are in your possession? *A.* Oh, yes.

"*Q.* Under your control? *A.* Yes, sir.

"*Q.* And you are able to produce them here if you want to? *A.* Yes; I could produce them.

"*Q.* If you want to? *A.* Yes, sir.

"*Q.* You decline to produce them? *A.* Yes, sir.

"*Q.* Not because they tend to criminate you for the year 1900? *A.* Perhaps.

"*Q.* Perhaps? *A.* I don't see how it could; no, sir. I decline to answer these questions on the ground our attorney says we don't have to. That is the sole reason I decline to produce them.

"*Q.* Will you look at your books and see, and then report to the grand jury what they show? *A.* Why, Mr. Attorney, why don't you get that information from the secretary? He is the man that handles the books. * * *

" *Q.* How many members of the common council were carried upon the free list, as appears from the records and

books in your office prior to the time that you became connected with the company ?  *A.* I decline to answer that question, also.

" *Q.* Because it would tend to criminate you ?  *A.* Yes, sir.

" *Q.* For no other reason ?  *A.* That is all.

" *Q.* That is your only reason ?  *A.* Yes, sir.

" *Q.* And yet you admit you had no connection with the company prior to that time ?  *A.* I was connected with another company on the same basis as the Bartlett Illuminating Company—with another branch concern.

" *Q.* You had nothing to do with the business of this branch ?  *A.* No interest, except I was interested indirectly in it.

" *Q.* Have any stock in it ?  *A.* No, sir.

" *Q.* Or an employé of the company ?  *A.* Not of this Bartlett Illuminating Company; no, sir.

" *Q.* Have you ever had any talk or conversation at any time or place with Alderman Hermann on this subject ?  *A.* I decline to answer that question.

" *Q.* Why ?  *A.* Might have a tendency to criminate me.

" *Q.* What—the talk you had with Hermann ?  *A.* Yes, sir.

" *Q.* You were mixed up in it with him—is that what you mean to say ?  *A.* I said I declined to answer the question that you put to me, on the ground that it might have a tendency to criminate me.

" *Q.* Yes; because you were mixed up in the matter with him ?  *A.* I didn't say so, Mr. O'Keefe.

" *Q.* Well, why would it tend to criminate you, if you had nothing to do with it ?  *A.* I am president of the company, and general manager when Mr. Hermann is out of town.

" *Q.* Do you have any knowledge of any crookedness in connection with this company ?  *A.* Crookedness; no, sir.

" *Q.* In letting this contract to the city ?  *A.* No, sir; none whatever.  There wasn't any.  The contract didn't warrant it.  If they contract to give you lights for $65, that don't warrant them spending money.  *  *  *

" *Q.* Has any officer of the company instructed you not to submit the books of the company to this grand jury, and, if so, who is he ?  *A.* Well, I can't be positive about

that.   I am not sure whether Mr. Bonta told me not to do it or not, but our attorney—

"*Q.* When did you see Mr. Bonta since this grand jury was called ?   *A.* Oh, I met him in Chicago about a week or ten days ago.

"*Q.* What did he tell you about transferring the names of certain aldermen from the F. L. list to the regular customers' list ?   *A.* I decline to answer that question.

"*Q.* Why ?   *A.* It might have a tendency to incriminate me.

"*Q.* Did you have any conversation with him upon that subject ?   *A.* I decline to answer that question also.

"*Q.* Because it might tend to criminate you ?   *A.* Yes, sir.

"*Q.* Are you president of the company ?   *A.* Yes, sir.

"*Q.* What is the man you met in Chicago ?   *A.* He is vice-president."

On the part of the people it is said:

"There are four cases that settle beyond controversy the law upon every question presented by the petitioner against his contention, viz., *In re Peasley*, 44 Fed. 271; *U. S. Express Co.* v. *Henderson*, 69 Iowa, 40; *Brown* v. *Walker*, 161 U. S. 591; *Wertheim* v. *Trust Co.*, 15 Fed. 716, note on page 721."

The note referred to in the last case discusses the use which may be made of the subpœna duces tecum, and does not aid in solving the question before us.   The case of *U. S. Express Co.* v. *Henderson*, supra, was one where the privilege was claimed not because the production of the books would tend to criminate the witness, but because they would tend to criminate the employer, and the court held that was not sufficient.   In the disposition of the case, the court said:

"If it had been claimed that the books called for tended to render the witness criminally liable, it may be that he could not properly be required to produce them."

*In re Peasley*, supra, and *Brown* v. *Walker*, supra, were both cases under the interstate commerce act, which act required persons to testify, and provided, among other things:

"But no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing, concerning which he may testify, or produce evidence, documentary or otherwise, before said commission, or in obedience to its subpœna, or the subpœna of either of them, or in any such case or proceeding." 27 U. S. Stat. at Large, 443.

And it was held that because of that provision the witness could not avail himself in this class of cases of the constitutional provision that he shall not be compelled to be a witness against himself. We have no such provision in this State applying to such a proceeding as was under investigation by the grand jury.

Amendment 5 of the Constitution of the United States reads as follows :

"No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

Section 32, art. 6, of the Constitution of this State, is as follows :

"No person shall be compelled, in any criminal case, to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law."

In the case of *People, ex rel. Taylor*, v. *Forbes*, 143 N. Y. 219, the witness had testified, in the broadest terms, that he had no connection with the transaction which was the subject of inquiry by the grand jury, but refused to answer further questions put to him upon the ground that the answer might tend to criminate him. The court adjudged him guilty of contempt. In reversing his conviction, after quoting the constitutional provisions, the court said :

"These constitutional and statutory provisions have long been regarded as safeguards of civil liberty quite as sacred and important as the privileges of the writ of habeas corpus, or any of the other fundamental guaranties for the protection of personal rights.   When a proper case arises, they should be applied in a broad and liberal spirit, in order to secure to the citizen that immunity from every species of self-accusation implied in the brief but comprehensive language in which they are expressed.   The security which they afford to all citizens against the zeal of the public prosecutor, or public clamor for the punishment of crime, should not be impaired by any narrow or technical views in their application to such a state of facts as appears from the record before us.   The right of a witness to claim the benefit of these provisions has frequently been the subject of adjudication in both the Federal and State courts. The principle established by these decisions is that no one shall be compelled in any judicial or other proceeding against himself, or upon the trial of issues between others, to disclose facts or circumstances that can be used against him as admissions tending to prove his guilt or connection with any criminal offense of which he may then or afterwards be charged, or the sources from which or the means by which evidence of its commission, or of his connection with it, may be obtained.   The cases cover the point so completely that no comment or explanation is necessary, and it would not be useful to quote at much length from the language in which the decisions are expressed.   It will be quite sufficient for every purpose of the opinion to note where they may be found:   *Counselman* v. *Hitchcock*, 142 U. S. 547; *Emery's Case*, 107 Mass. 172; *State* v. *Nowell*, 58 N. H. 314; *Ex parte Boscowitz*, 84 Ala. 463; *Minters* v. *People*, 139 Ill. 363; *Temple* v. *Commonwealth*, 75 Va. 892; *Printz* v. *Cheeney*, 11 Iowa, 469; *People* v. *Mather*, 4 Wend. 230; *In re Hackley*, 24 N. Y. 84; *People* v. *Sharp*, 107 N. Y. 427; 1 Burr's Trial, 245.   The question was fully discussed at an early day by Chief Justice Marshall on the trial of Aaron Burr, and every phase of it so completely explained and exhausted that his views were followed in the subsequent decisions. A single quotation from the language used will illustrate the scope and extent of the immunity which the witness can lawfully claim:

"'Many links frequently compose that chain of testimony which is necessary to convict any individual of a crime.   It appears to the

court to be the true sense of the rule that no witness is compellable to furnish any one of them against himself. It is certainly not only a possible but a probable case that a witness by disclosing a single fact may complete the testimony against himself, and to every effectual purpose accuse himself as entirely as he would by stating every circumstance which would be required for his conviction. That fact of itself might be unavailing, but all other facts without it would be insufficient. While that remains concealed within his own bosom he is safe, but draw it from thence and he is exposed to a prosecution. The rule which declares that no man is compellable to accuse himself would most obviously be infringed by compelling a witness to disclose a fact of this description.' * * *

" The testimony which the relator voluntarily gave before the grand jury, in general terms exonerating himself from all connection with the transaction, seems to have had great weight with the learned trial judge. It was argued that the relator could not possibly be put in peril by his answer to the question, since he had already testified that he had no connection with the transaction. But the conclusion was not warranted by the facts. The testimony of the witness might be ever so strong and clear in favor of his innocence, but it did not conclude the public prosecutor, in the absence of some constitutional or statutory provision securing the relator from prosecution. The general statements of a person charged with crime, in regard to his innocence, avail but little against incriminating facts and circumstances. His protestations of innocence and his broad general denial of any knowledge of or connection with the transaction might be overcome by facts and circumstances if the district attorney could be permitted to draw them from the witness. Any one who has had much experience in the conduct of criminal trials is aware of the fact that frequently the most dangerous proof that a person charged with crime has to meet are his own statements made for the purpose of warding off suspicion, or of satisfying others with regard to his innocence. It is not unusual on such trials to confront the accused with his own declarations made for the very purpose of exonerating himself from all suspicion, but which, when all the evidence is collected, are so far at war with all the facts and circumstances as to furnish evidence of guilt. The witness, by answering the general questions as to his connection with the affair, whether his answers were true or false, did not waive his right to remain silent when it was sought to draw from him

some fact or circumstance which, in his judgment, might form another link in the chain of facts, and capable of being used under any circumstances to his detriment or peril. The circumstances relating to the purchase of the jugs, and the means employed to place them under the banquet room, were important as furnishing a clue that might lead to the identification of the guilty person or persons, and the witness was or appeared to be so related to the transaction that he might lawfully refuse to furnish the same, notwithstanding his general statements to the effect that he had nothing whatever to do with them. The witness who knows what the court does not know, and what he cannot disclose without accusing himself, must in such cases judge for himself as to the effect of his answer, and if, to his mind, it may constitute a link in the chain of testimony, sufficient to convict him, when other facts are shown, or to put him in jeopardy, or subject him to the hazard of a criminal charge, indictment, or trial, he may remain silent. While the guilty may use the privilege as a shield, it may be the main protection of the innocent, since it is quite conceivable that a person may be placed in such circumstances, connected with the commission of a criminal offense, that, if required to disclose other facts within his knowledge, he might, though innocent, be looked upon as the guilty party. *Adams* v. *Lloyd,* 3 Hurlst. & Nor. 363."

In the case of *Temple* v. *Commonwealth,* 75 Va. 892, the court, in disposing of the case, used the following language :

" It is argued, however, that it is a question within the discretion of the court, always, whether the witness shall be compelled to answer, and that the court must judge in the case before it whether the witness will criminate himself, and that the witness is not to judge of that fact for himself.

" Upon this question there has been some conflict in the English decisions. But in this country the great weight of authority is in favor of the rule that where the witness, on oath, declares his belief that the answer to the question would criminate or tend to criminate him, the court cannot compel him to answer unless it is perfectly clear, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer cannot possibly have such tendency. See *Fries* v. *Brugler,* 21

Am. Dec. 52, 57 (12 N. J. Law, 79), and cases there cited.

"In the famous Burr trial, Chief Justice Marshall said:

"'It is the province of the court to judge whether any direct answer to the question which may be proposed will furnish evidence against the witness. If such answer may disclose a fact, which forms a necessary and essential link in the chain of testimony, which would be sufficient to convict him of any crime, he is not bound to answer it so as to furnish matter for that conviction. In such a case the witness must himself judge what his answer will be, and if he say, on oath, that he cannot answer without accusing himself, he cannot be compelled to answer.'

"In the case of *People* v. *Mather*, 4 Wend. 229, 254. Judge Marcy said:

"'If the witness thinks the answer may in any way criminate him, the court must allow his privilege, without exacting from him to explain how he would be criminated by the answer which the truth may oblige him to give. If the witness was obliged to show how the effect is produced, the protection would at once be annihilated.'

"See, also, *Queen* v. *Boyes*, 101 Eng. C. L. R. 309, 329 [1 Best & Sm. 311]. I think, upon the authority of these decisions, it may be safely said that wherever a party, on oath, declares that the answer to the question propounded to him will criminate himself, the court must accept that answer as true, and as making a prima facie case in which the witness must be excused unless there is something in the circumstances of the particular case which makes it appear either that the witness contumaciously refuses to answer, or where it appears that, from all circumstances, he is clearly mistaken as to any possibility of his future prosecution. The witness ought not in any case to be compelled to answer after declaring on oath that such answer may criminate himself, especially after he has taken the advice of counsel, unless it clearly appears to the court that he is mistaken. In the case before us it appears that the plaintiff in error, while held in jail as a witness, consulted with counsel, who advised him that he would criminate himself if he testified in the case against Berry, and gave the same testimony which he had given before the grand jury. The court might well have inquired into the fact whether he had actually received such advice of counsel, or, if it believed that such counsel was disreputable,

and that the advice was given simply to protect the offender or to shield a contumacious or bribed witness, all these matters might have been properly inquired into by the court. But here we have a case where a witness states that he has consulted counsel, and that counsel has advised him not to answer the question propounded to him, because it would criminate himself; and there is not a suggestion in the record that there was any motive, either in the witness or in his counsel, other than to raise the legal question whether he could be compelled to testify in a case where such testimony might tend to criminate the witness."

See, also, *Boyd* v. *United States*, 116 U. S. 616; *Counselman* v. *Hitchcock,* 142 U. S. 547; *United States* v. *Burr*, Fed. Cas. No. 14,692 e; *Adams* v. *Lloyd*, 3 Hurlst. & Nor. 351, at 361–363; *People* v. *Lauder*, 82 Mich. 109; *Entick* v. *Carrington*, 19 How. State Trials, 1063; Cooley, Constitutional Limitations (6th Ed.), pp. 364–373; *In re Archer*, 134 Mich. 408.

Applying these principles to the case at bar, I think the privilege claimed by Mr. Moser was within his constitutional right, and should have been respected.

I think it not necessary to discuss the second question raised by counsel, and that the conviction should be set aside and the petitioner discharged.