MARKMAN, J.
This Court granted leave to appeal to consider whether the rule announced in People v Bender, 452 Mich 594; 551 NW2d 71 (1996), should be maintained. Bender requires police officers to promptly inform a suspect facing custodial interrogation that an attorney is available when that attorney attempts to contact the suspect. If the officers fail to do so, any statements made by the suspect, including voluntary statements given by the suspect with full knowledge of his Miranda rights,[1] are rendered inadmissible. Because there is nothing in this state’s Constitution to support that rule, we respectfully conclude that Bender was wrongly decided and that it must be overruled. We therefore reverse the trial court’s suppression of certain *204 incriminating statements made by defendant, which suppression was justified solely on the grounds of Bender, and remand to the trial court for further proceedings consistent with this opinion.
I. FACTS
Defendant George Tanner was arrested for murder and taken to jail on October 17, 2011. He was read his Miranda rights, and when police officers attempted to interview defendant at the jail, he invoked his right to counsel. As a result, the officers informed defendant that he would have to reinitiate contact if he subsequently changed his mind and wished to speak to them. The next day, while a psychologist employed by the jail to interview inmates was speaking with defendant, he said that he wanted to “get something off his chest.” The psychologist told defendant that he should not further discuss the case with her, that he might wish to speak to an attorney, and that she could make arrangements for him to speak to the police officers. Defendant again stated that he wanted to “get things off his chest,” so the psychologist told defendant that she would inform jail staff of his request. She then contacted the jail administrator and informed him that defendant wished to speak to police officers about his case.
The administrator spoke with defendant, told him that the psychologist had indicated that he wanted to “get something off his chest,” and inquired whether he still wished to speak to someone about his case. Defendant replied “yes” and asked if the administrator could obtain an attorney for him. The administrator responded that he could not, because this was not his role, but explained that he could contact the police officers who were handling the case. Defendant replied that this *205 would be fine, and the administrator contacted the officers. The administrator also called the prosecutor, who advised him that the court would appoint an attorney for defendant should he request one. The prosecutor apparently informed the court of defendant’s request, as a result of which an attorney was sent to the jail.
One of the police officers testified that he was contacted by the administrator and apprised that defendant might now be amenable to speaking with the officers. The police officer further testified that he confirmed with the administrator that defendant had not requested that an attorney be present during the interview, and that the administrator believed an attorney had been appointed merely as a contingency in the event defendant sought an attorney during the interview. Subsequently, both the police officers and an attorney appeared at the jail. Apparently unsure of his role, the attorney asked the officers and the administrator if they knew why he was there. The administrator responded and told him to wait in the jail lobby while he took the officers back to speak with defendant and determine his intentions.
Defendant was again read his Miranda rights, which he waived this time without requesting an attorney and without being made aware of the attorney’s presence. The administrator then instructed the attorney that he could leave. Defendant shortly thereafter made incriminating statements concerning his involvement in the murder. He was eventually charged with open murder, MCL 750.316, and mutilation of a dead body, MCL 750.160. Defendant was bound over to circuit court following a preliminary examination. During this process, defense counsel filed a motion to suppress defendant’s statement to the police, alleging that because he *206 had not been informed that an attorney had been appointed for him before his interrogation, his Miranda waiver was invalid under this Court’s decision in Bender. A hearing was held on October 12, 2011, after which the trial court suppressed defendant’s statement. The court determined that defendant had requested an attorney at his October 17, 2011 interrogation, but that he had affirmatively reinitiated contact with police officers on October 18, 2011, without reasserting his right to counsel. However, it also determined that defendant’s statement required suppression under Bender, because the police officers had failed to inform him that an attorney was present at the jail and had established contact with the officers.
The prosecutor filed an application for leave to appeal in the Court of Appeals, which was denied for lack of merit, and he then filed an application for leave to appeal in this Court, requesting that Bender be reconsidered. We granted this application, People v Tanner, 493 Mich 958 (2013), and heard oral argument on this case on November 6, 2013.
II. STANDARD OF REVIEW
This court “review[s] a trial court’s factual findings in a ruling on a motion to suppress for clear error. To the extent that a trial court’s ruling on a motion to suppress involves an interpretation of the law or the application of a constitutional standard to uncontested facts, our review is de novo.” People v Attebury, 463 Mich 662, 668; 624 NW2d 912 (2001).
III. BACKGROUND
The Fifth Amendment of the United States Constitution provides that “[n]o person . . . shall be compelled *207 in any criminal case to be a witness against himself.” US Const, Am V See also Const 1963, art 1, § 17 (containing an identical Self-Incrimination Clause). This federal constitutional guarantee was made applicable to the states through the Fourteenth Amendment. Malloy v Hogan, 378 US 1, 3; 84 S Ct 1489; 12 L Ed 2d 653 (1964). Prior to 1966, a suspect’s confession was constitutionally admissible if a court determined that it was made “voluntarily.”[2] Despite the apparent textual emphasis on the voluntariness of a suspect’s confession (“no person shall be compelled”), the United States Supreme Court held in Miranda v Arizona, 384 US 436, 444-445, 477-479; 86 S Ct 1602; 16 L Ed 2d 694 (1966), that the accused must be given a series of warnings before being subjected to “custodial interrogation” in order to protect his constitutional privilege against self-incrimination.[3] The right to have counsel present during custodial interrogation is, in the words of the United States Supreme Court, a corollary of the right against compelled self-incrimination, because the presence of counsel at this stage affords a way to “insure that statements made in the government-established atmosphere are not the product of compulsion.” Id. at 466. See also id. at 470. If a suspect is not afforded *208 Miranda warnings before custodial interrogation, “no evidence obtained as a result of interrogation can be used against him.” Id. at 479 (citations omitted).
Once a suspect invokes his right to remain silent or requests counsel, police questioning must cease unless the suspect affirmatively reinitiates contact.[4] Id. at 473-474. In Edwards v Arizona, 451 US 477, 484-485; 101 S Ct 1880; 68 L Ed 2d 378 (1981) (citations omitted), the United States Supreme Court created “additional safeguards” for when the accused invokes his right to have counsel present during custodial interrogation:
[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. ... [H]aving expressed his desire to deal with the police only through counsel, [an accused] is not subject to further interrogation by the authorities until counsel has been made available to *209 him, unless the accused himself initiates further communication, exchanges, or conversations with the police.
However, when a suspect has been afforded Miranda warnings and affirmatively waives his Miranda rights, subsequent incriminating statements may be used against him. Miranda, 384 US at 444, 479. A suspect’s waiver of his Miranda rights must be made “voluntarily, knowingly, and intelligently.” Id. at 444. The United States Supreme Court has articulated a two-part inquiry to determine whether a waiver is valid:
First, the relinquishment of the right must have been “voluntary,” in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the “totality of the circumstances surrounding the interrogation” reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived. [Moran v Burbine, 475 US 412, 421; 106 S Ct 1135; 89 L Ed 2d 410 (1986), citing Fare v Michael C, 442 US 707; 99 S Ct 2560; 61 L Ed 2d 197 (1979).]
Under the Fifth Amendment construct set forth by the United States Supreme Court, the defendant in the instant case was afforded his Miranda rights by the police and invoked his right to counsel on October 17, 2011. Defendant then reinitiated contact with the police the next day when he indicated that he wanted to “get something off his chest” and speak with the officers. He was then afforded his Miranda rights a second time, and on this occasion waived those rights and chose not to reassert his right to counsel. During the following custodial interrogation by the police officers, defendant made an incriminating statement concerning his involvement in a murder. The only pertinent question *210 then is whether defendant’s lack of awareness of the appointed attorney’s presence at the jail at the time of his Miranda waiver following his reinitiation of contact with the police calls into question the validity of that waiver, including the waiver of his right to counsel— rendering it something other than “voluntary, knowing, and intelligent” — and thus requires suppression of any subsequent incriminating statements.
A. MORAN v BURBINE
The United States Supreme Court has addressed this question for purposes of the federal criminal justice system in Moran v Burbine, 475 US 412; 106 S Ct 1135; 89 L Ed 2d 410 (1986), in which it held that the failure of police to inform a suspect of the efforts of an attorney to reach that suspect does not deprive the suspect of his right to counsel or otherwise invalidate the waiver of his Miranda rights. In Moran, the defendant confessed to the murder of a young woman after he had been informed of, and waived, his Miranda rights. While the defendant was in custody, his sister retained an attorney to represent him. The attorney then contacted the police and was assured that all questioning would cease until the next day. However, less than an hour later, the police resumed interrogation of the defendant, and he confessed soon thereafter. At no point during the interrogation did the defendant request an attorney, and at no point did the police inform him that an attorney had contacted them. Before trial, the defendant moved to suppress his confession on the basis that “the police’s failure to inform him of the attorney’s telephone call deprived him of information essential to his ability to knowingly waive his Fifth Amendment rights.” Id. at 421. However, the trial court denied the defendant’s motion, concluding that he had received Miranda warn *211 ings, and had “knowingly, intelligently, and voluntarily waived his privilege against self-incrimination [and] his right to counsel.” Id. at 418. The defendant was subsequently convicted of murder. The Rhode Island Supreme Court affirmed his conviction, and the federal district court denied his habeas corpus petition. The federal appellate court, however, reversed the conviction. On further appeal, the United States Supreme Court reinstated the defendant’s conviction, asserting as follows:
Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right. Under the analysis of the Court of Appeals, the same defendant, armed with the same information and confronted with precisely the same police conduct, would have knowingly waived his Miranda rights had a lawyer not telephoned the police station to inquire about his status. Nothing in any of our waiver decisions or in our understanding of the essential components of a valid waiver requires so incongruous a result. No doubt the additional information would have been useful to respondent; perhaps even it might have affected his decision to confess. But we have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights. Once it is determined that a suspect’s decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State’s intentions to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law. [Id. at 422-423 (citations omitted).]
Any culpability on the part of the police inherent in their failing to inform the defendant of the attorney’s availability had no bearing on the validity of his Miranda waiver:
*212 [Wjhether intentional or inadvertent, the state of mind of the police is irrelevant to the question of the intelligence and voluntariness of [the defendant’s] election to abandon his rights. Although highly inappropriate, even deliberate deception of an attorney could not possibly affect a suspect’s decision to waive his Miranda rights unless he were at least aware of the incident. ... Granting that the “deliberate or reckless” withholding of information is objectionable as a matter of ethics, such conduct is only relevant to the constitutional validity of a waiver if it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them. Because respondent’s voluntary decision to speak was made with full awareness and comprehension of all the information Miranda requires the police to convey, the waivers were valid. [Id. at 423-424 (citations omitted).]
A rule requiring a suspect to be kept apprised of an attorney’s presence in order for his Miranda waiver to be valid would unsettle Miranda's balance between protection of a suspect’s Fifth Amendment rights and the maintenance of effective and legitimate law enforcement practices:
Because, as Miranda holds, full comprehension of the rights to remain silent and request an attorney are sufficient to dispel whatever coercion is inherent in the interrogation process, a rule requiring the police to inform the suspect of an attorney’s efforts to contact him contribute to the protection of the Fifth Amendment privilege only incidentally, if at all. This minimal benefit, however, would come at a substantial cost to society’s legitimate and substantial interest in securing admissions of guilt. [Id. at 427.]
Moran concluded that “nothing disables the States from adopting different requirements of the conduct of its employees and officials as a matter of state law.” Id. at 428.
*213 B. PEOPLE v BENDER
This Court reached a different conclusion from that of Moran in Bender, 452 Mich 594 (1996), holding that for a suspect’s Miranda waiver to be made “knowingly and intelligently,” police officers must promptly inform a suspect that an attorney is available when that attorney has made contact with them. In Bender, two defendants, Jamieson Bender and Scott Zeigler, were arrested for a series of thefts and taken into custody. An officer informed Bender’s mother of his arrest. Subsequently, Bender’s father called an attorney, who agreed to represent his son. When the attorney called the police and sought to speak with Bender, she was not permitted to do so. Defendant Ziegler’s mother called an attorney, who instructed her go to the police station and tell her son not to speak with anyone before speaking with the attorney. Police also did not allow Ziegler’s mother to see her son and communicate the attorney’s message. Without informing the defendants of their attorneys’ efforts to contact them, police read the defendants their Miranda rights, defendants waived these rights, and each offered incriminating statements concerning their involvement in the thefts. At no point did the defendants request an attorney or assert their rights either to remain silent or to have counsel.
This Court adopted a per se rule that a suspect who has an attorney waiting in the wings does not make a “knowing and intelligent” waiver of his Miranda rights when the police have failed to inform him that an attorney has been made available to him and is at his disposal. Id. at 620 (opinion by CAVANAGH, J.). See also id. at 621 (opinion by BRICKLEY, C.J.). Although Justices LEVIN and MALLETT concurred with Justice CAVANAGH’s lead opinion grounding the rule in Michigan’s 1963 Constitution, the Court’s holding was not ultimately *214 grounded upon constitutional principles. Rather, Chief Justice BRICKLEY concurred with the result reached in the lead opinion, but declined to rely upon its interpretation of the Constitution, instead declaring that the requirement that an accused must be informed of an attorney’s efforts to contact him constituted, as did Miranda itself at the time, a “prophylactic,” or precautionary, rule. Id. at 620-621 (opinion by BRICKLEY, C.J.).[5] Justices CAVANAGH, LEVIN, and MALLETT also joined Chief Justice BRICKLEY’s concurrence, making it the operative opinion in the case.[6] Justice BOYLE, joined by Justices Riley and Weaver, dissented.
Although it did not provide the operative holding, the lead opinion grounded its reasoning upon independent state constitutional grounds, concluding, “we hold that, on the basis of Const 1963, art 1, § 17, neither defendant Bender nor defendant Zeigler made a knowing and intelligent waiver of his rights to remain silent and to counsel, because the police failed to so inform them [that attorneys had been retained and sought to contact them] before they confessed.”[7] Id. at 614 (opinion by CAVANAGH, J.). Holding otherwise would “encourage the police to do everything possible, short of a due process *215 violation, to prevent an attorney from contacting his client before or during interrogation.” Id. at 615. To further sustain its conclusion, the lead opinion also noted that this Court has held that “the Michigan Constitution imposes a stricter requirement for a valid waiver of the rights to remain silent and to counsel than those imposed by the federal constitution.” Id. at 611, citing People v Wright, 441 Mich 140, 147; 490 NW2d 351 (1992). The lead opinion declined to adopt a “totality-of-the-circumstances test,” because the “inherently coercive nature of incommunicado interrogation requires a per se rule that can be implemented with ease and practicality to protect a suspect’s rights to remain silent and to counsel.” Bender, 452 Mich at 617 (opinion by CAVANAGH, J.).
In Chief Justice BRICKLEY’s “majority opinion,”[8] he stated that
[t]his case rather clearly implicated both the right to counsel (Const 1963, art 1, § 20) and the right against self-incrimination (Const 1963, art 1, § 17). I conclude that rather than interpreting these provisions, it would be more appropriate to approach the law enforcement practices that are at the core of this case in the same manner as the United States Supreme Court approached the constitutional interpretation task in Miranda v Arizona; namely, by announcing a prophylactic rule.
The right to counsel and the right to be free of compulsory self-incrimination are part of the bedrock of constitutional civil liberties that have been zealously protected and in some cases expanded over the years. Given the focus and protection that these particular constitutional provisions have received, it is difficult to accept and constitutionally justify a rule of law that accepts that law enforcement *216 investigators, as part of a custodial interrogation, can conceal from suspects that counsel has been made available to them and is at their disposal. If it is deemed to be important that the accused be informed that he is entitled to counsel, it is certainly important that he be informed that he has counsel. [Id. at 620-621 (opinion by BRICKLEY, C.J.) (citations omitted).]
Thus, the majority opinion, although referring to Michigan’s Constitution for its “implications,” declined nonetheless to interpret its provisions. Rather, it concluded that “we invite much mischief if we afford police officers ‘engaged in the often competitive enterprise of ferreting out crime’ the discretion to decide when a suspect can and cannot see an attorney who has been retained for a suspect’s benefit.” Id. at 622, quoting Girodenello v United States, 357 US 480, 486; 78 S Ct 1245; 2 L Ed 2d 1503 (1958). Instead, according to Chief Justice BRICKLEY, Bender’s rule would ensure that the criminal justice system remained accusatorial and not inquisitorial in nature, because the “good will of state agents is often insufficient to guarantee a suspect’s constitutional rights.” Bender, 452 Mich at 623 (opinion by BRICKLEY, C.J.).
Justice BOYLE, joined by Justices RILEY and WEAVER, dissented:
[W]ithout a single foundation in the language, historical context, or the jurisprudence of this Court, a majority of the Court engrafts its own “enlightened” view of the Constitution of 1963, art 1, § 17, on the citizens of the State of Michigan. With nothing more substantial than a disagreement with the United States Supreme Court as the basis for its conclusion, a majority of the Court ignores our obligation to ñnd a principled basis for the creation of new rights and imposes a benefit on suspects that will eliminate voluntary and knowledgeable confessions from the arsenal of society’s weapons against crime. [Id. at 624 (Boyle, J., dissenting).]
*217 According to the dissent in Bender, the guarantee against compelled self-incrimination found in Article 1, § 17 of the Michigan Constitution provides no greater protection than the Fifth Amendment of the United States Constitution, and there is no justification for an interpretation of Michigan’s Constitution that affords protections differently than the federal Constitution. Id. at 628-629. The Bender dissent concluded that
[i]n its haste to create a novel “Miranda-like rightf],” a majority of the Court blurs the distinction between the constitutional right to be free from compelled self-incrimination and the safeguards — Miranda warnings — created to protect that right. In effect, a majority of the Court creates prophylactic rules to protect prophylactic rights. The argument seems to be that it is necessary to inform a suspect that an attorney is attempting to contact him, which, in turn, effectuates the suspect’s right to counsel, which, in turn, effectuates a suspect’s right to remain silent, which, in turn, effectuates a suspect’s right to be free from compelled self-incrimination. Safeguards for safeguards is absurd and is not required by the Michigan Constitution, the federal constitution, or Miranda.
Given... that neither the Michigan nor the federal constitution require extension of the Miranda litany, the majority’s only possible justification for requiring the police to inform a suspect that an attorney wishes to speak with him must be grounded on policy concerns, not constitutional mandates. But policy concerns also fail under proper analysis. [Id. at 644.]
In sum, while Bender concluded that the failure of police officers to inform a suspect of an attorney’s attempts to communicate with the suspect invalidates his Miranda waiver, there was no agreement as to whether Michigan’s Constitution required that rule.
*218 IV ANALYSIS
The question presently before this Court is whether the rule of Bender should be maintained.[9] The first and most consequential inquiry in resolving this question must, of course, pertain to whether Bender was correctly decided. We conclude that it was not, concurring with the Bender dissent that the lead and majority opinions in that case engaged in an unfounded creation of “constitutional rights,” given that the lead opinion failed to undertake a constitutional analysis sufficient to ground rights in our “organic instrument of state government,” Sitz v Dep’t of State Police, 443 Mich 744, 760; 506 NW2d 209 (1993), and the majority opinion failed even to consider that same “organic instrument,” instead relying on policy concerns and fears of law enforcement “mischief.”
*219 A. THE BENDER RULE
The Bender majority cited no Michigan law to justify its creation of a state constitutional rule different from the United States Supreme Court’s federal constitutional rule in Moran, ironically citing only several United States Supreme Court decisions at variance with Moran. Nonetheless, Moran rightly acknowledged, as it must, that its decision did not “disableG the States from adopting different requirements for the conduct of its employees and officials as a matter of state law.” Moran, 475 US at 428.[10] However, the Bender majority neither analyzed nor compared and contrasted to its federal counterpart the text of Article 1, § 17; cited no Michigan caselaw contrary to Moran-, and most notably declined to ground its decision upon any interpretation of state constitutional provisions. At the same time nonetheless, the majority clearly sought to characterize its rule as being one of constitutional provenance.* [11] *220 Indeed, two years after Bender, in People v Sexton, 458 Mich 43, 70-72; 580 NW2d 404 (1998), then Justice BRICKLEY explained in his dissenting statement that
[w]hile the Bender rule is prophylactic in nature like Miranda, that fact does not detract from its constitutional underpinnings. Its very purpose is to protect a suspect’s right to counsel and the privilege against self-incrimination. To deny the constitutional import of this rule is to ignore the plain language set forth in Bender. [Citation omitted.]
Thus, the majority purported to articulate a state constitutional rule in Bender, prophylactic or otherwise, distinct from the federal constitutional rule in Moran,[12] while apparently disclaiming all reliance on state constitutional provisions.
B. THE MICHIGAN CONSTITUTION
To determine whether Michigan’s Constitution supports Bender, we must construe our Constitution. It is “a fundamental principle of constitutional construction that we determine the intent of the framers of the Constitution and of the people adopting it,” Holland v Heavlin, 299 Mich 465, 470; 300 NW 777 (1941), and we do this principally by examining its language. Bond v Ann Arbor Sch Dist, 383 Mich 693, 699-700; 178 NW2d 484 (1970). And we must do this even in the face of existing decisions of this Court pertaining to the same subject because there is no other judicial body, state or *221 federal, that possesses the authority to correct misinterpretations of the Michigan Constitution.
“In interpreting our Constitution, we are not bound by the United States Supreme Court’s interpretation of the United States Constitution, even where the language is identical.” People v Goldston, 470 Mich 523, 534; 682 NW2d 479 (2004) (citation omitted). Rather, “[this Court] must determine what law ‘the people have made.’ ” Id. (citation omitted). “[W]e may not disregard the guarantees that our constitution confers on Michigan citizens merely because the United States Supreme Court has withdrawn or not extended such protection” under the federal Constitution. Sitz, 443 Mich at 759. As explained in Sitz:
[T]he courts of this state should reject unprincipled creation of state constitutional rights that exceed their federal counterparts. On the other hand, our courts are not obligated to accept what we deem to be a major contraction of citizen protections under our constitution simply because the United States Supreme Court has chosen to do so. We are obligated to interpret our own organic instrument of government. [Id. at 763.]
While members of this Court take an oath to uphold the United States Constitution, we also take an oath to uphold the Michigan Constitution,[13] which is the enduring expression of the will of “we, the people” of this state.[14] In light of these separate oaths of office, we need *222 not, and cannot, defer to the United States Supreme Court in giving meaning to the latter charter.[15] Instead, it is this Court’s obligation to independently examine our state’s Constitution to ascertain the intentions of those in whose name our Constitution was “ordain[ed] and established].”[16] Accordingly, we must examine the *223 text and history of Article 1, § 17, as well as this Court’s precedents pertaining to this provision, in order to ascertain both whether Bender was correctly decided and whether there is persuasive force in the United States Supreme Court’s decision in Moran.* 1***5*****[17]
1. CONSTITUTIONAL TEXT
“The primary objective in interpreting a constitutional provision is to determine the text’s original meaning to the ratifiers, the people, at the time of ratification.” Wayne Co v Hathcock, 471 Mich 445, 468; 684 NW2d 765 (2004). “The first rule a court should follow in ascertaining the meaning of words in a constitution is to give effect to the plain meaning of such *224 words as understood by the people who adopted it.” Bond, 383 Mich at 699. “In applying this principle of construction, the people are understood to have accepted the words employed in a constitutional provision in the sense most obvious to the common understanding and to have ‘ratified the instrument in the belief that that was the sense designed to be conveyed.’ ” People v Nutt, 469 Mich 565, 573-574; 677 NW2d 1 (2004) (citation omitted).
The text of Article 1, § 17 of the Michigan Constitution does not, in our judgment, provide for the rights articulated in Bender, when it states in the same words as the Fifth Amendment to the United States Constitution that “no person shall be compelled in any criminal case to be a witness against himself.”[18] Ascertaining the “plain meaning” of “compelled” is of critical importance to our textual analysis, as we must determine precisely what type of protection the ratifiers intended to confer. The 1828 edition of Webster’s American Dictionary of the English Language defined “compel” as “[t]o drive or urge with force, or irresistibly”; “to constrain”; “to oblige”; or “to necessitate, either by physical or moral force.” At the time that our 1963 Constitution was ratified, the term “compel” was commonly defined as “to force by physical necessity or *225 evidential fact”; “to urge irresistibly by moral or social pressure”; “to domineer over so as to force compliance or submission”; or “to obtain by force, violence, or coercion.” Webster’s Third New International Dictionary (1961). Thus, at the time of the ratification of Article 1, § 17, the word “compel” referred to the use of coercion, violence, force, or pressure, all of which are relevant factors in assessing the genuine voluntariness of a confession.
The remainder of the terms contained in Article 1, §17 require no individual examination, as their plain meanings appear “obvious to the common understanding.” Accordingly, applying the definition of “compel” to the remainder of the language of Article 1, § 17, we find that the compelled self-incrimination provision in its entirety can be understood to provide that “no person shall be [coerced, forced, or pressured] in any criminal case to be a witness against himself.” Given the provision’s focus on a coercive custodial environment, Article 1, § 17 can be reasonably understood to protect a suspect from the use of his involuntary incriminating statements as evidence against him in a criminal case. Consequently, the text of Article 1, § 17 does not support Bender, which pertains not to the voluntariness of the confession itself, but to whether a suspect’s Miranda waiver has been made “knowingly.” That is, there was no dispute in Bender as to the voluntariness of the defendant’s confession, only as to whether his Miranda waiver could be made “knowingly” absent awareness of an attorney’s efforts to contact him; the coercion or pressure contemplated by the text of Article 1, § 17, which relates to the voluntariness of a confession, was not implicated.[19]
*226 2. CONSTITUTIONAL CONVENTION
When interpreting a constitutional provision, “Regard must also be given to the circumstances leading to the adoption of the provision and the purpose sought to be accomplished.” People v Nash, 418 Mich 196, 209; 341 NW2d 439 (1983) (citation omitted). In determining the meaning of particular constitutional provisions to the ratifiers of the Constitution, this Court has noted that “constitutional convention debates and the address to the people, though not controlling, are relevant.” Id. (citation omitted).[20] The primary focus should be on “any statements [the delegates] may have made that *227 would have shed light on why they chose to employ the particular terms they used in drafting the provision to aid in discerning what the common understanding of those terms would have been when the provision was ratified by the people.” Studier v Mich Pub Sch Employees’ Retirement Bd, 472 Mich 642, 656-657; 698 NW2d 350 (2005) (citation omitted).[21]
However, the records pertaining to Article 1, § 17 provide few such clues. There appears to have been no debate on the provision when it was first incorporated. When the Constitution was ratified in 1908, the Self-Incrimination Clause remained unchanged from the 1850 version, and the accompanying Address to the People in 1908 stated simply, “[n]o change from Sec. 32, Art. VI of the present constitution.” Journal of the Constitutional Convention 1907-1908, p 1542. Although Article 1, § 17 was ratified in 1963, the only change was the addition of language that had no bearing on the Self-Incrimination Clause, and it was only the new language that was the subject of any convention debate or explication. 1 Official Record, Constitutional Convention 1961, pp 545-553; 2 Official Record, Constitutional Convention 1961, p 3364. We find nothing in the records of the constitutional conventions to suggest that Article 1, § 17 means anything different from what its text most reasonably expresses.
*228 3. CONSTITUTIONAL CASELAW
Although the text of Article 1, § 17 has mirrored its federal counterpart since its incorporation, the conclusion does not follow that this Court has interpreted the provision identically to the United States Supreme Court’s interpretation of the Fifth Amendment. Consequently, it is necessary to examine this Court’s precedent to determine whether caselaw in any way supports or contradicts Bender.
Before Bender, this Court had previously addressed the effect of an attorney’s attempts to contact a suspect on the admissibility of the suspect’s confession in People v Cavanaugh, 246 Mich 680; 225 NW 501 (1929), and People v Wright, 441 Mich 140; 490 NW2d 351 (1992), the latter cited in Bender and both cited by defendant in this case. However, neither opinion provides the foundation for Bender’s proposition that Michigan courts have historically interpreted Michigan’s compulsory self-incrimination provision to provide criminal suspects with greater protections than those afforded by the Fifth Amendment.
In Cavanaugh, the juvenile defendant was sentenced to prison for life for committing a rape in light of evidence that the victim identified his voice and given his alleged confession of guilt. The defendant testified at trial that the police had questioned him at night, that he had not been permitted to sleep, and that he asked for and was denied an attorney. An attorney who had been retained by the defendant’s father came to the police station, but was refused access to the defendant until the attorney proceeded to the courthouse to obtain a writ of habeas corpus. It is unclear if the defendant was aware of the attorney’s presence, but in any event, he admitted to committing the crime. At trial, the defendant repudiated this confession, claiming it had *229 been extorted by duress, brow-beating, intimidation, and by holding him incommunicado. The lower court sustained the prosecutor’s objection to the defendant’s proposed testimony regarding the circumstances surrounding his confession and did not permit the defendant to introduce evidence pertaining to his claim that police officers had held him incommunicado.
On appeal, this Court reversed the defendant’s conviction and remanded for a new trial, concluding that the “[djefendant had an undoubted right to lay before the jury his full claim of what the police said to him, and it was for the jury to say whether, under all the circumstances, the confession was voluntary.” Cavanaugh, 246 Mich at 686. This Court continued:
[A] confession, extorted by mental disquietude, induced by unlawfully holding an accused incommunicable, is condemned by every principle of fairness, has all the evils of the old-time letter de cachet, is forbidden by the constitutional guaranty of due process of law, and inhibited by the right of an accused to have the assistance of counsel.... Holding an accused incommunicable to parents and counsel is a subtle and insidious method of intimidating and cowing, tends to render a prisoner plastic to police assertiveness and demands, and is a trial of mental endurance under unlawful pressure.
The defendant was held incommunicable. He could not send for or employ counsel. His father was refused right to see him. When an attorney, presumably employed by his father, appeared at the jail and asked to see defendant, he was refused the right to do so until the attorney started for the courthouse to get a writ of habeas corpus. In this State a parent may not be denied the right to see and have conversation with a child in jail and accused of crime. Neither may police, having custody of one accused of crime, *230 deny an attorney, employed by or in behalf of a prisoner, the right to see and advise the accused. [Id. at 686, 688 (emphasis added).]
This Court concluded that “[w]hether defendant’s call for father, mother, attorney, and priest did not make any difference upon the question of his alleged confession being voluntary was for the jury.” Id. at 688-689. Consequently, defendant was entitled to a new trial, “at which the most searching examination of all the circumstances surrounding his alleged confession will be permitted.” Id. at 689.
Although Cavanaugh, like Bender, addressed the admissibility of a confession in a circumstance in which an attorney had been denied access to a person facing custodial interrogation, Cavanaugh is distinguishable from Bender in at least three significant ways, and cannot provide its foundation. First, whereas Bender pertained to whether the defendants’ waivers of their Miranda rights were made “knowingly,” Cavanaugh pertained only to whether the defendant’s confession was made voluntarily, as Miranda had not yet introduced into the Fifth Amendment analysis the rule that a defendant cannot be subject to custodial interrogation absent a “voluntary, knowing, and intelligent” waiver of Miranda rights.[22] Because there was no dispute in Bender regarding the voluntary nature of defendants’ incriminating statements, Cavanaugh’s analysis concerning voluntariness cannot provide support for Bender. Second, Cavanaugh appropriately considered multiple factors — only one of which was the police *231 officer’s refusal to allow an attorney access to the defendant — in its “totality of the circumstances” analysis to assess whether the defendant’s confession was made voluntarily, an analysis which at that time was the accepted mechanism for determining compliance with constitutional standards. However, Bender’s rule, invalidating all “unknowing” Miranda waivers, is a per se rule that pertains to just a single factor. Cavanaugh cannot possibly support this per se rule, given that Cavanaugh provided no indication that this Court had ever determined that just one of its several factors — the police officer’s refusal to allow the attorney to see the defendant — gave rise to an independent and per se constitutional right.[23] Third, in Cavanaugh, the juvenile defendant requested and was refused an attorney. This Court properly considered the defendant’s rejected request for an attorney as one factor in its voluntariness analysis. In contrast, in Bender, the defendants *232 never requested an attorney before waiving their Miranda rights and providing incriminating statements.[24] Accordingly, the defendants perceived no rejected request that could act to create a coercive atmosphere and potentially call into question the voluntariness of their statements. Given these significant differences, Cavanaugh lends no support, we believe, to the notion that Michigan’s Constitution supports the per se rule of Bender[25]
In Wright, the defendant was arrested for murder, taken to the police station at around 5:00 a.m., and informed of his Miranda rights. The defendant ultimately offered an incriminating statement to police officers after being deprived of food, water, and a place to sleep for a total of eleven hours while awaiting questioning. Before the defendant made his statement, his family retained an attorney who made at least two trips to the police station, requesting to speak with the defendant. Police officers refused the attorney’s request both times. The defendant ultimately gave a statement to the police without being informed of the attorney’s efforts to reach him. Before trial, the defendant filed a motion to suppress his statement. At the suppression hearing, the trial court denied the defendant’s motion, concluding that the defendant had never expressly asked for an attorney. The trial court relied on Moran, reasoning that “although the police conduct was repre *233 hensible, the law did not require the suppression of defendant’s statements.” Wright, 441 Mich at 145-146 (opinion by MALLETT, J.). The Court of Appeals affirmed, declining to impose more stringent standards on police conduct than the United States Supreme Court imposed in Moran. The defendant then appealed in this Court, and we granted leave to appeal to consider “whether a defendant has a right to know of his attorney’s efforts to contact him” and “whether the failure by police to provide a defendant with proper food, water, or opportunity to sleep, renders a defendant’s statements involuntary.” Id. at 146.
In an opinion by Justice MALLETT, joined by Justice LEVIN, and separate opinions by Chief Justice CAVANAGH and Justice BRICKLEY, this Court suppressed the defendant’s statements. The fragmented decision resulted in no binding precedent. In the lead opinion, Justice MALLET concluded that the confession had to be suppressed because a suspect must be informed of an attorney’s in-person attempts to contact him, as Michigan’s Constitution provides for such a right. Id. at 154-155. This opinion stated as follows:
[U]nder our state’s laws, we conclude that [defendant] did not make a knowing, voluntary, and intelligent waiver of his rights when the police, before he made a statement, refused to inform him that retained counsel tried or was currently trying to contact him. Without this knowledge, [the defendant] could not make a truly voluntary waiver of his essential rights. Given the opportunity to speak to a specific, retained and available attorney, [defendant’s] decision may have been different.
Under Const 1963, art 1, § 17, a criminal suspect is given the right against self-incrimination, a right similar to that provided in the Fifth Amendment of the United States *234 Constitution. This Court has held that the interpretation of our constitutional privilege against self-incrimination and that of the Fifth Amendment are the same. In re Moser, 138 Mich 302, 305; 101 NW 588 (1904). However, as the United States Supreme Court concluded in Moran, states are free to adopt more protective standards under state law. Because we believe that it was necessary, in order to allow [defendant] to make a knowing and fully voluntary waiver of his Fifth Amendment rights, we extend the rights afforded under Const 1963, art 1, § 17, to include information of retained counsel’s in-person efforts to contact a suspect. [Id. at 153-154 (citations omitted.]
In his separate concurrence, Chief Justice CAVANAGH agreed with Justice MALLETT’s conclusion that the defendant’s statement had to be suppressed and with Justice MALLETT’s analysis in interpreting Michigan’s constitutional privilege against self-incrimination “more broadly” than the Fifth Amendment. Chief Justice CAVANAGH wrote separately to emphasize that the “conclusion is even more clearly supported on the ground that the police conduct in this case violated defendant’s right to counsel under Const 1963, art 1, § 20.” Id. at 155-156 (CAVANAGH, C.J., concurring). In a separate concurring opinion, Justice BRICKLEY agreed that suppression of the defendant’s statement was necessary, but based his decision on his conclusion that the defendant’s Miranda waiver was made involuntarily, citing the “eleven-hour incommunicado interrogation during which [the defendant] was deprived of food, sleep, and contact with friendly outsiders, combined with the fact that he was not informed of available retained counsel.” Id. at 172 (BRICKLEY, J., concurring). Justice RILEY dissented, joined by Justices BOYLE and GRIFFIN, concluding that defendant had knowingly waived his right to consult with an attorney before making his statement, and that the “objectionable” police conduct did not amount to a constitutional viola *235 tion. Id. at 179-180 (RILEY, J., dissenting). The dissent noted that “[t]here is nothing conspicuous in the language of the Michigan Constitution that would distinguish it from the rights guaranteed by the federal constitution.” Id. at 177.
Wright cannot provide the foundation for Bender, because it produced no consensus that Article 1, § 17 of Michigan’s Constitution imposes greater requirements for a valid waiver of the rights to remain silent and to counsel than those imposed by the federal Constitution,[26] and its lead opinion, much like Bender’s majority opinion, suffered from scant analysis. The lack of analysis in both opinions is accounted for by the simple fact that there is no basis in the Michigan Constitution for the decisions reached in those opinions. That is, it is not the failure of analyses in these opinions that militates against their extension of Miranda-, it is the absence of any language in the Michigan Constitution that would sustain such an analysis, and that is why each of these opinions is so barren of constitutional exegesis. Only Justice MALLETT’s lead opinion in Wright explicitly “extend[ed] the rights afforded under Const 1963, art 1, § 17” to provide greater protection than those afforded by the Fifth Amendment. Wright, 441 Mich at 154 (opinion by MALLETT, J.). Justice LEVIN concurred, and Justice CAVANAGH agreed with Justice MALLETT’s analysis, but no other member of this Court accepted the lead opinion’s proposition, and Justice RILEY, joined by Justices BOYLE and GRIFFIN, explicitly rejected such a conclusion in her dissent. In any event, the lead opinion cannot provide a foundation for Bender, as it peremp *236 torily concluded that the “accusatorial” nature of our criminal justice system warranted an “extension of] the rights afforded under Const 1963, art 1, § 17,” without anywhere confronting the language of this provision or assessing in any way the intentions of the ratifiers.
Instead, in opining that Article 1, § 17 requires police to inform suspects of an attorney’s efforts to contact a suspect in order that a Miranda waiver be valid, the lead opinion acknowledged that it “disagree [d] ” with the Supreme Court’s conclusion to the contrary in Moran, and noted that “states are free to afford their citizens greater protection than that granted by the federal government.” Wright, 441 Mich at 148 (opinion by MALLETT, J.). Doubtless this is true, but such authority on our part does not relieve us from the obligation to ground our actions within our own Constitution. The lead opinion opined further, “[o]ther states have considered [Moran’s] question and have concluded that it is necessary for a suspect to be informed of an attorney’s attempted contacts,” and proceeded to summarize the decisions of the highest state courts of Connecticut, Delaware, and Oregon. Id. at 148-153. Such an observation, while also entirely appropriate as a prelude to extending Miranda, also does not relieve us of the obligation to “determine what law ‘the people [of Michigan] have made.’ ” Sitz, 443 Mich at 759. This obligation is best accomplished by some effort to examine the language of our Constitution that purportedly supplies the basis for the newly discovered constitutional right, Bond, 383 Mich at 699-700, in this instance, Article 1, § 17. However, without engaging in any such analysis, the lead opinion turned to the facts of Wright, and offered the following:
*237 As Justice Stevens so eloquently stated, “[t]he recognition that ours is an accusatorial, and not an inquisitorial system nevertheless requires that the government’s actions, even in responding to this brutal crime, respect those liberties and rights that distinguish this society from most others.” Moran, [475 US] at 436 (Stevens, J., dissenting). Accordingly, under our state’s laws, we conclude that Mr. Wright did not make a knowing, voluntary, and intelligent waiver of his rights when the police, before he made a statement, refused to inform him that retained counsel tried or was currently trying to contact him. Without this knowledge, Mr. Wright could not make a truly voluntary waiver of his essential rights. Given the opportunity to speak to a specific, retained and available attorney, Mr. Wright’s decision may have been different. [Wright, 441 Mich at 153 (opinion by MALLETT, J.).]
The lead opinion concluded that while “this Court has held that the interpretation of our constitutional privilege against self-incrimination and that of the Fifth Amendment are the same,” it was nevertheless appropriate to “extend the rights afforded by Const 1963, art 1, § 17, to include information of retained counsel’s in-person efforts to contact a suspect.” Id. at 154. The opinion was correct that this Court may interpret our constitution to afford greater protections than those afforded by the Fifth Amendment. However, the opinion did not perform the constitutional analysis necessary to “determine the intent of the framers and of the people adopting it,” Holland, 299 Mich at 470. Consequently, Wright’s “extension of] the rights afforded under Const 1963, art 1, § 17,” cannot provide Bender’s foundation, because that extension was not supported by a majority of this Court, and it was not based on any semblance of the constitutional analysis necessary to ground new rights in the Michigan Constitution, an analysis that would seem to be of particular prudence in distinguishing an interpretation of a provision of the *238 Michigan Constitution from a United States Supreme Court interpretation of the United States Constitution. Cf. Nash, 418 Mich at 209.
While this analysis indicates that there is no precedent specifically undergirding Bender,[27] it is also relevant to examine this Court’s caselaw pertaining to Article 1, § 17, as well as to the admissibility of confessions in general, to inquire whether there is any other historical support from this Court for Bender. Specifically, we examine whether there is any precedent that foreshadowed Bender by suggesting either that (a) this Court has interpreted the self-incrimination provision of Article 1, § 17 to extend beyond the protections afforded by the Fifth Amendment; or (b) this Court has *239 interpreted the self-incrimination provision of Article 1, § 17 as focused on something other than the voluntariness of a confession.
Concerning the first matter of exploration, there is no precedent that serves as a precursor to Bender by-affording protections under Article 1, § 17 greater than those afforded under the Fifth Amendment. To the contrary, on at least two occasions, this Court had discussed the meaning of Michigan’s Self-Incrimination Clause in comparison to the Fifth Amendment and indicated that Michigan’s Self-Incrimination Clause is identical to its federal counterpart. In In re Moser, 138 Mich 302, 305; 101 NW 588 (1904), we noted that “[u]nder the Constitutions of Michigan and of the United States, no witness can be compelled to give testimony which might tend to criminate himself or expose him to a criminal prosecution. The provision in each Constitution is the same.” Eighty years later, in Paramount Pictures Corp v Miskinis, 418 Mich 708, 726; 344 NW2d 788 (1984), we cited Moser and stated that “[h]aving examined prior decisions of this Court, we find nothing which requires an interpretation of our constitutional privilege against self-incrimination different from that of the United States Constitution.” Moser and Paramount are instructive in that they provide insight concerning the legal environment at the time Bender was decided. Until that point, our interpretations of Article 1, § 17 provided no indication that this Court was prepared to extend the protections of Article 1, § 17 to exceed those of the Fifth Amendment.[28]
*240 Concerning the second matter of exploration, while Bender implicates the “knowing” prong of a Miranda waiver, this Court’s precedents indicate that Article 1, § 17 pertains solely to the voluntariness of a confession. “Under Michigan law, initially the admissibility of confessions was governed solely by common law, which adhered to the rule that involuntary confessions were inadmissible.” People v Conte, 421 Mich 704, 721; 365 NW2d 648 (1984) (citations omitted). Subsequently, this Court recognized a constitutional basis for this rule, acknowledging that both the Due Process Clause, Cavanaugh, 246 Mich at 686, and the right against self-incrimination, People v Louzon, 338 Mich 146; 61 NW2d 52 (1953), provide alternate bases for holding involuntary confessions inadmissible. Before Miranda, few cases analyzed the admissibility of a confession in light of the Self-Incrimination Clause, but this Court did so in People v Louzon:
We recognize the rule that confessions are inadmissible when secured by inflicting physical force or its equivalent by means of harsh or cruel treatment or false promises. The confession must be voluntary, but this does not mean that it must be volunteered. No one may be forced to be a witness against himself. [Louzon, 338 Mich 153-154 (emphasis added).]
Thus, this Court’s use of the Self-Incrimination Clause to analyze the admissibility of a confession focused entirely on the voluntariness of the confession, referring to the type of force or coercion that is contemplated in part by the text of Article 1, § 17. Sometime after Louzon, Miranda transformed the inquiry pertaining to the admissibility of confessions, introducing the concept *241 of a “voluntary, knowing, and intelligent” waiver of a suspect’s Miranda rights. Before Miranda under Michigan law, voluntariness constituted the sole criteria for a confession to be admissible, under either the Due Process Clause, or Michigan’s Self-Incrimination Clause, providing no support for Bender’s proposition that Article 1, § 17 pertains in any way to whether a Miranda waiver is made “knowingly.”
In his dissent, Justice CAVANAGH disagrees with this conclusion, and instead asserts that Cavanaugh foreshadowed Miranda’s “knowing and intelligent” requirement by holding that defendant’s confession was obtained in violation of what is now Article 1, § 17, due to the “incommunicable” nature of the defendant’s interrogation. According to the dissent, “incommunicado interrogation was at the center of the United States Supreme Court’s explanation of the ‘knowing and intelligent’ requirement in Miranda,” and “[because Cavanaugh’s explanation of the impropriety of the incommunicado interrogation methods used to extract the defendant’s confession is strikingly similar to the impermissible interrogation methods that Miranda discussed, Cavanaugh is . . . more properly classified as consistent with Miranda’s ‘knowing and intelligent’ standard.” Post at 264.
However, as previously noted, Cavanaugh explicitly pertained only to the voluntariness of a confession, and the “incommunicable” nature of defendant’s interrogation was only one factor among many that persuaded this Court to remand for a determination whether defendant’s confession was voluntary.[29] Although Ca *242 vanaugh in no way transformed this Court’s traditional voluntariness analysis, even assuming arguendo that Cavanaugh recognized that more subtle forms of coercion might render a confession involuntary, there is simply no indication that Cavanaugh contemplated the “knowing and intelligent” requirement set forth almost four decades later in Miranda, as Cavanaugh nowhere hinted that a defendant must have some idea of his or her “rights” and the consequences of waiving those rights in order for his or her confession to be admissible. As Miranda had not yet introduced the concept of a waiver made “knowingly and intelligently,” it is highly unlikely that Cavanaugh contemplated such a requirement, or that the ratifiers of the 1963 Constitution perceived Cavanaugh as setting forth such a requirement, particularly in view of the fact that Cavanaugh performed the traditional totality of the circumstances voluntary analysis that was routinely undertaken in determining the admissibility of a confession at that time.[30] As even Justice CAVANAGH’s dissent acknowl *243 edges, “when interpreting the Michigan Constitution, we must recognize the law as it existed in Michigan at the time the relevant constitutional provision was adopted, and ‘it must be presumed that a constitutional provision has been framed and adopted mindful of prior and existing law and with reference to them.’ People v Kirby, 440 Mich 485, 492; 487 NW2d 404 (1992).” Post at 258-259 (emphasis added). The trajectory of our constitutional development under our equivalent of the Fifth Amendment, as well as this Court’s consistent emphasis on the voluntariness of a confession, including in Cavanaugh, indicated no anticipation of Miranda, a notion as to which defense counsel himself agreed at oral argument.[31] Furthermore, Cavanaugh was decided under the Due Process Clause, and not the Self-Incrimination Clause, further suggesting that the ratifiers of the 1963 Constitution would not have perceived Cavanaugh as establishing that Michigan’s provision against compulsory self-incrimination provided any greater protections than those afforded by the Fifth Amendment. Accordingly, neither Cavanaugh, nor any other precedent of this Court, supports the dissent’s assertion that Article 1, § 17 was ratified in contemplation of the “knowing” requirement later set forth in Miranda.[32]
*244 Moreover, this Court’s precedent provides no support for the proposition that this Court has placed extra emphasis on the “knowing” prong of a Miranda waiver in the period since Miranda. Before and after Miranda, “[wjhere conditions did not overbear a defendant’s will, statements have been held admissible.” Wright, 441 Mich at 167, citing People v Brannan, 406 Mich 104; 276 NW2d 14 (1979); People v Farmer, 380 Mich 198; 156 NW2d 504 (1968); People v Boyce, 314 Mich 608; 23 NW2d 99 (1946). Even after Miranda and Bender, this Court has referred to Moran for the appropriate “knowing and intelligent” waiver standard, and stated that “[t]o knowingly waive Miranda rights, a suspect need not understand the ramifications and consequences of choosing to waive or exercise the rights that the police have properly explained to him” and “[l]ack of foresight is insufficient to render an otherwise proper waiver invalid.” People v Cheatham, 453 Mich 1, 28-29; 551 NW2d 355 (1996) (citations omitted). Thus, Bender’s heightened requirement for a Miranda waiver to be made “knowingly” is inconsistent with this Court’s previous treatment of the requirement.
This Court’s precedents did not foreshadow, or otherwise provide support, for Bender. Nor do this Court’s precedents support a finding that Article 1, § 17 requires a greater showing that a Miranda waiver was made “knowingly” than is required by the Fifth Amendment, given that this Court’s interpretation of Article 1, §17 has indicated that it pertains solely to the voluntariness of a confession itself, not to whether a confession is made with full knowledge of its consequences.[33]
*245 4. BENDER vs. MORAN
This Court’s independent constitutional analysis of Article 1, § 17 leads us to the conclusion that Moran, not Bender, best analyzes the issue presented in this case. Our analysis indicates that Article 1, § 17 protects a suspect only from the use of confessions or incriminating statements obtained by coercion, violence, force, or pressure. However, Bender’s rule renders confessions and incriminating statements inadmissible that were in no way influenced by the type of coercive or compelling atmosphere contemplated by the provision.
Miranda was initially intended by the United States Supreme Court (at least until its later decision in Dickerson)[34] to serve as “one possible formula” by which *246 to dispel the coercive atmosphere implicit in custodial interrogation; its purpose was to alleviate what it viewed as the increasingly subtle and nuanced forms of coercion that sometimes typified the custodial interrogation process and undermined the genuine voluntariness of statements produced by this process. In fact, the United States Supreme Court has explained that “Miranda protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that.” Colorado v Connelly, 479 US 157, 170; 107 S Ct 515; 93 L Ed 2d 473 (1986). However, the situation in Bender falls considerably outside the scope of the custodial interrogation process that defined the constitutional rationale for Miranda. That is, Bender’s rule renders inadmissible even statements and confessions made following an indisputably voluntary and informed Miranda waiver absent even the slightest hint of the subtle or nuanced forms of coercion that served as the justification for Miranda. Miranda’s treatment of such forms of coercion at least sought to remain faithful to the Fifth Amendment’s traditional voluntariness standard.[35]
*247 Our independent examination of Article 1, § 17 supports Moran’s conclusion that “full comprehension of [the Miranda rights] are sufficient to dispel whatever coercion is inherent in the interrogation process,” Moran, 464 US at 427, because the warnings provide a suspect with the necessary information both to apprehend these rights and to make an intelligent and knowing waiver of the rights if he chooses. The waiver of rights cannot logically be affected by events that are unknown and unperceived, such as the fact that an attorney is somewhere present to offer assistance. As explained by one scholar:
If there is any police misconduct, the suspect is unaware of such events because it is directed toward the attorney. Facts and events unknown to the suspect cannot have a coercive effect on the suspect. Therefore, the attorney’s efforts and/or presence is irrelevant to the suspect’s ability to make a voluntary, knowing, and intelligent waiver of his Miranda rights. Moreover, as the suspect is still read his Miranda rights, such events do not operate to deprive the suspect of the knowledge of his rights.
To argue or conclude that a defendant, who by the good fortune of a family member hiring an attorney, must be told of the attorney’s attempts to make contact in order to make a knowing and intelligent waiver of Miranda rights is illogical and nonsensical. In fact, for the majority’s reasoning to make sense, the majority would have to conclude that persons who are capable of retaining an attorney, or have family or friends who are capable of hiring a retained attorney, are not capable of making a knowing and intelli *248 gent waiver of Miranda rights even when the attorney is not present. As is evident by the admissibility of a suspect’s Miranda waiver in the ordinary custodial interrogation situation, the majority would not so conclude. [Carroll, A Look at People v Bender: What Happens when the Michigan Supreme Court Oversteps Its Power to Achieve A Results-Oriented Decision, 74 U Det Mercy L Rev 211, 236-237 (1997) (citations omitted).]
We therefore agree with Moran that an outside and unperceived development, such as an attorney’s presence and initiation of contact with police, “can have no bearing on [a suspect’s] capacity to comprehend and knowingly relinquish a constitutional right.” Moran, 475 US at 422.[36] Instead, as noted by the United States Supreme Court in Colorado v Spring, 479 US 564, 577; 107 S Ct 851; 93 L Ed 2d 954 (1987), “the additional information could affect only the wisdom of a Miranda waiver, not its essentially voluntary and knowing nature.” It might not be in a suspect’s best interest to make a statement, but this Court need not concern itself with the wisdom of a suspect’s confession. To the contrary, voluntary but “foolish” confessions should be welcomed, as a suspect’s perhaps unwise but purely voluntary urge to tell the truth is vital in assisting the fact-finder in ultimately ascertaining the truth of what occurred.[37]
*249 In sum, independent examination of Article 1, § 17 persuades us that the United States Supreme Court correctly interpreted this issue in Moran. This examination further supports Moran’s conclusions that “[e]vents occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right,” that the “ ‘deliberate or reckless’ withholding of information ... is only relevant to the constitutional validity of a waiver if it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them,” and that the Miranda warnings alone “are sufficient to dispel whatever coercion is inherent in the interrogation process.” Moran, 475 US at 422-424, 427. Because our constitutional analysis demonstrates that Article 1, § 17 does not confer the protections set forth in Bender, but instead supports Moran’s analysis and conclusion, we conclude that Bender was wrongly decided. We conclude, as did the United States Supreme Court in Moran, that the failure of police to inform a suspect of an attorney’s efforts to contact him does not invalidate an otherwise “voluntary, knowing, and intelligent” Miranda waiver.
*250 C. STARE DECISIS
When this Court determines that a case has been wrongly decided, as we do here with regard to Bender, it must next determine whether it should overrule that precedent, a decision that should never be undertaken lightly. The application of stare decisis is “generally ‘the preferred course, because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.’ ” Robinson v Detroit, 462 Mich 439, 463; 613 NW2d 307 (2000), quoting Hohn v United States, 524 US 236, 251; 118 S Ct 1969; 141 L Ed 2d 242 (1998). However, “stare decisis is a ‘principle of policy’ rather than ‘an inexorable command,’ and... the Court is not constrained to follow precedent when governing decisions are unworkable or are badly reasoned.” Robinson, 462 Mich at 464 (citations omitted). This Court has discussed the proper circumstances under which it will overrule prior case law:
This Court has stated on many occasions that “[u]nder the doctrine of stare decisis, principles of law deliberately examined and decided by a court of competent jurisdiction should not be lightly departed.” ...[.] “Before this court overrules a decision deliberately made, it should be convinced not merely that the case was wrongly decided, but also that less injury will result from overruling than from following it.” When it becomes apparent that the reasoning of an opinion is erroneous, and that less mischief will result from overruling the case rather than following it, it becomes the duty of the court to correct it. [People v Graves, 458 Mich 476, 480-481; 581 NW2d 229 (1998) (citations omitted) (alteration in original).]
When performing a stare decisis analysis, this Court should review inter alia “whether the decision at issue defies ‘practical workability,’ whether reliance interests would work an undue hardship, and whether changes in *251 the law or facts no longer justify the questioned decision.” Robinson, 462 Mich at 464 (citation omitted). As for the rebanee interest, “the Court must ask whether the previous decision has become so embedded, so accepted, so fundamental to everyone’s expectations that to change it would produce not just readjustments, but practical real-world dislocations.” Id. at 466.
When questions before this Court implicate the Constitution, this Court arguably has an even greater obligation to overrule erroneous precedent. “[A] judicial tribunal is most strongly justified in reversal of its precedent when adherence to such precedent would perpetuate a plainly incorrect interpretation of the language of a constitutional provision or statute.” Nawrocki v Macomb Co Rd Comm, 463 Mich 143, 181; 615 NW2d 702 (2000), citing Robinson, 462 Mich at 463-468. This is because “the pobey of stare decisis ‘is at its weakest when we interpret the Constitution because our interpretation can be altered only by constitutional amendment or by overruling our prior decisions.’ ” Kyser v Kasson Twp, 486 Mich 514, 534, n 15; 786 NW2d 543 (2010), quoting Agostini v Felton, 521 US 203, 235; 117 S Ct 1997; 138 L Ed 2d 391 (1997). Thus, it is “our duty to reexamine a precedent where its reasoning or understanding of the Constitution is fairly cabed into question.” Robinson, 462 Mich at 464, quoting Mitchell v W T Grant Co, 416 US 600, 627-628; 94 S Ct 1895; 40 L Ed 2d 406 (1974) (Powell, J., concurring). Although Bender disclaimed rebanee on Michigan’s Constitution, it nonetheless vaguely referred to its provisions in enacting its “prophylactic” rule, suggesting that this Comb has a duty to review this decision under less deferential standards of stare decisis in bght of our role as the final judicial arbiter of this Constitution.[38]
*252 We conclude that overruling Bender would not produce “practical real-world dislocations,” primarily because Bender obviously cannot be said to have caused suspects to “alter their conduct in any way.” See People v Petit, 466 Mich 624, 635; 648 NW2d 193 (2002). As Moran noted, “[e]vents occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right.” Moran, 475 US at 422. It seems highly unlikely that a suspect being interrogated, after a day earlier having expressly refused to waive his right to counsel and then reconsidering that decision by affirmatively seeking to speak with police and then expressly waiving his right to counsel, would thereafter rely on Bender in determining that he need not ask for an attorney because the officers have a legal duty to inform him that an attorney has initiated contact with them. Although a suspect might later come to have second thoughts and prefer that he had not waived his right to counsel, “[s]uch after-the-fact awareness does not rise to the level of a reliance interest because to have reliance the knowledge must be of the sort that causes a person or entity to attempt to conform his conduct to a certain norm before the triggering event.” Robinson, 462 Mich at 466-467. Consequently, Bender has not become so “fundamental to everyone’s expectations” that to overrule it *253 would result in “real-world dislocations.” Id. at 466. Further, that Bender can fairly be considered to be “workable,” in the sense that the police may clearly understand their legal obligations to a defendant and his attorney, does not render “practically unworkable” a regime in which a defendant’s rights are just as clearly understood.
Contrary to Bender, we do not believe that increased “mischief” will result from this Court’s failure to maintain the rule expounded in that case as the constitutional law of this state. As already noted, we agree with Moran that the constitutional “voluntariness” of a confession or incriminating statement is not implicated by the failure of police to inform the defendant of the presence of an attorney before proceeding with a custodial interrogation after Miranda warnings have been given and Miranda rights waived. Whether a defendant does or does not possess knowledge of an attorney’s outside presence cannot affect whether that defendant understands the rights that he or she is waiving, and neither the United States Supreme Court nor this Court has ever accepted the proposition that an attorney must be present in order that a Miranda waiver be characterized as “voluntary, knowing, and intelligent.”
Moran accurately highlighted the competing policies informing both Miranda and its progeny, including Moran itself:
Custodial interrogations implicate two competing concerns. On the one hand, “the need for police questioning as a tool for effective enforcement of criminal laws” cannot be doubted. Admissions of guilt are more than merely “desirable,” they are essential to society’s compelling interest in finding, convicting, and punishing those who violate the law. On the other hand, the Court has recognized that the interrogation process is “inherently coercive” and that, as a consequence, there exists a substantial risk that the *254 police will inadvertently traverse the fine line between legitimate efforts to elicit admissions and constitutionally impermissible compulsion. Miranda attempted to reconcile these opposing concerns by giving the defendant the power to exert some control over the course of the interrogation. ... Police questioning, often an essential part of the investigatory process, could continue in its traditional form, the Court held, but only if the suspect clearly understood that, at any time, he could bring the proceeding to a halt or, short of that, call in an attorney to give advice and monitor the conduct of his interrogators.
The position urged by [defendant] would upset this carefully drawn approach in a manner that is both unnecessary for the protection of the Fifth Amendment privilege and injurious to legitimate law enforcement. Because, as Miranda holds, full comprehension of the rights to remain silent and request an attorney are sufficient to dispel whatever coercion is inherent in the interrogation process, a rule requiring the police to inform the suspect of an attorney’s efforts to contact him would contribute to the protection of the Fifth Amendment privilege only incidentally, if at all. This minimal benefit, however, would come at a substantial cost to society’s legitimate and substantial interest in securing admissions of guilt. [Moran, 475 US at 426-427 (citations omitted).]
The Moran Court’s concern that further protections against self-incrimination, such as those set forth in Bender, would impinge on the effectiveness of law enforcement are entirely valid, in our judgment. Neither the Fifth Amendment nor Article 1, § 17 is hostile to custodial interrogations — only to those in which there is some coercive environment. Similarly, neither the Fifth Amendment nor Article 1, § 17 is hostile to confessions and self-incrimination — only to those which are “compelled.” Indeed, confessions and incriminating statements constitute perhaps the most compelling and important evidence available to fact-finders in the justice system’s search for truth. Suppression of such *255 evidence as the result of a Bender violation deprives these fact-finders of evidence allowing them to distinguish truth from falsity and innocence from guilt, while avoiding the conviction of innocent persons and the exoneration of guilty persons, all in pursuit of a principle that has never since the founding of our republic or state been viewed as a constitutional violation.[39]
Although overruling Bender will undeniably result in some unknown number of confessions and incriminating statements that might otherwise not have been provided, such evidence will have been voluntarily offered and have been preceded by “voluntary, knowing, and intelligent” waivers of Miranda rights. This evidence is to be welcomed, not repudiated, by any rational and effective criminal justice system. It is hard to comprehend a societal interest that is furthered by protecting persons who have engaged in serious criminal activities from the consequences of their own voluntary and intelligent decisions. While Justice CAVANAGH’s dissent claims that “this statement entirely ignores the overriding principle of our criminal justice system: that a suspect is presumed innocent until proven guilty beyond a reasonable doubt,” post at 282, we are inclined instead to concur with Justice BOYLE who observed in her Bender dissent that, “ [i]f properly administered and validly waived, *256 the Miranda warnings ensure protection of a defendant’s right against compulsory self-incrimination, while at the same time allowing the police to fulfill their duty in a constitutionally permissible manner.” Bender, 452 Mich at 626 (BOYLE, J., dissenting).
Because we believe that less, not more, “mischief” will likely result from overruling the case, we are further persuaded of the need to overrule Bender. See Graves, 458 Mich at 480-481, citing McEvoy v Sault Ste Marie, 136 Mich 172, 178; 98 NW 1006 (1904) (stating that in reversing precedent, the Court “should be convinced not merely that the case was wrongly decided, but also that less injury will result from overruling than from following it”).
V CONCLUSION
An examination of Michigan’s Constitution and a review of this Court’s precedents compel the conclusion that Bender was wrongly decided and should now be overruled. In accordance with Moran, we hold that “[o]nce it is determined that a suspect’s decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State’s intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law.” Moran 475 US at 422-423. Although this Court need not interpret a provision of our Constitution in the same manner as a similar or identical federal constitutional provision, we are persuaded in the present instance, on the basis of our examination of Article 1, § 17, that the United States Supreme Court’s interpretation of the Self-Incrimination Clause of the Fifth Amendment in Moran constitutes the proper interpretation of Article I, § 17 as well. We reverse the trial court’s suppression of *257 incriminating statements made by defendant during custodial interrogation and remand to that court for further proceedings consistent with this opinion.
Young, C.J., and Kelly, Zahra, and Viviano, JJ., concurred with MARKMAN, J.

 Miranda v Arizona, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

 See Brown v Mississippi, 297 US 278; 56 S Ct 461; 80 L Ed 682 (1936) (a confession is inadmissible if extorted by brutality and violence); Chambers v Florida, 309 US 227, 238-239; 60 S Ct 472; 84 L Ed 716 (1940) (the defendant’s confession was inadmissible when made “under circumstances calculated to break the strongest of nerves and stoutest resistance”); Ashcraft v Tennessee, 322 US 143; 64 S Ct 921; 88 L Ed 1192 (1944) (the modern voluntariness test began to emerge in Ashcraft, in which the Court examined the totality of the circumstances to determine whether a confession was voluntary).

 “Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.” Id. at 444.

 Some have referred to Miranda as establishing what is essentially the equivalent of a “right not to be questioned”:
A final innovation of the Miranda decision was the creation of a right on the part of arrested persons to prevent questioning. The Court stated: “If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease .... If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.”
The right not to be questioned was an addition to the traditional right to refrain from answering questions on grounds of potential self-incrimination. At the time of the Constitution, suspects had no right to cut off custodial interrogation, and no right of this sort was recognized in the Supreme Court’s decisions prior to Miranda.... [United States Department of Justice, Office of Legal Policy, The Law of Pretrial Interrogation, 22 U Mich J L Reform 393, 484 (1989), quoting Miranda, 384 US at 473-474.]

 In Dickerson v United States, 530 US 428, 438-440, 444; 120 S Ct 2326; 147 L Ed 2d 405 (2000), the United States Supreme Court determined that although Miranda is “prophylactic in nature,” it is nonetheless a “constitutional rule that Congress may not supersede legislatively.”

 “The clear rule in Michigan is that a majority of the Court must agree on a ground for decision in order to make that binding precedent for future cases.” People v Anderson, 389 Mich 155, 170; 205 NW2d 461 (1973), overruled on other grounds by People v Hickman, 470 Mich 602; 684 NW2d 267 (2004).

 The lead opinion acknowledged that “neither defendant’s statement was involuntary.” Id. at 604. Consequently, the only focus was upon whether the defendants’ statements were made “knowingly and intelligently.”

 Although Chief Justice BRICKLEY’s opinion is labeled as a concurrence, it is practically speaking a majority opinion, and thus I will refer to it as such throughout this opinion.

 In Justice McCormack’s dissent, she asserts that the instant case does not afford an appropriate vehicle to overrule Bender because, unlike defendants in Bender, defendant here repeatedly expressed his desire for counsel before ultimately making an incriminating statement to the police. According to the dissent, the rule in Bender is “sufficient” to sustain the suppression of defendant’s statement, but is not “necessary” in order to do so, because the voluntariness of defendant’s statement was implicated, or called into question, by defendant’s failed attempts to invoke his right to counsel. However, in defendant’s motion to suppress, he acknowledged that his statement to law enforcement was entirely voluntary, and argued only that his Miranda waiver had not been undertaken knowingly and intelligently pursuant to Bender and Wright, on the basis of the police’s failure to inform him that an attorney had been appointed on his behalf and had sought to meet with him. Thus, whether defendant’s statement was undertaken voluntarily is not an issue that has been raised in this Court. Furthermore, because defendant clearly and explicitly relied on Bender in his motion to suppress, and because the trial court also clearly and explicitly relied on Bender in granting this motion, the instant case does indeed afford an appropriate vehicle by which to assess the precedential value of Bender. Whether defendant’s statement should be suppressed on other constitutional grounds can be considered on remand, provided both that such constitutional arguments have not been precluded by defendant’s pursuit of the current motion and that counsel offers the appropriate pretrial motions.

 “Under the Supremacy Clause, the courts of this state are obliged to enforce the rights conferred by the United States Supreme Court even if the state constitution does not provide such rights.” Sitz, 443 Mich at 759 (citation omitted). However, an “organic instrument of state government” need not he “interpreted as conferring the identical right.” Id. at 760. “It is only where the organic instrument of government purports to deprive a citizen of a right granted by the federal constitution that the instrument can be said to violate the constitution.” Id. at 760-761 (emphasis added). Accordingly, this Court may interpret our Constitution in a manner that confers greater protections on a suspect than those mandated by federal law.

 For example, the majority acknowledged that “[t]his case rather clearly implicates both the right to counsel and the right against [compulsory] self-incrimination” before concluding that a prophylactic rule was appropriate. Bender, 452 Mich at 620-621 (opinion by Brickley, C.J.) (citations omitted). The majority continued that “the right to counsel and the right to he free of compulsory self-incrimination are part of the bedrock of constitutional civil liberties that have been zealously protected and in some cases expanded over the years,” and that “[g]iven the focus and protection that these particular constitutional provisions *220 have received, it is difficult to accept and constitutionally justify a rule of law that accepts that law enforcement investigators, as part of a custodial interrogation, can conceal from suspects that counsel has been made available to them and is at their disposal.” Id. at 621.

 The Bender Court had the undeniable authority to articulate a state constitutional rule as long as the individual protections set forth in Moran were not contracted.

 Const 1963, art 11, § 1 states: “All officers, legislative, executive and judicial, before entering upon the duties of their respective offices, shall take and subscribe the following oath or affirmation: I do solemnly swear (or affirm) that I will support the Constitution of the United States and the constitution of this state, and that I will faithfully discharge the duties of the office ... according to the best of my ability.” See also US Const, art VI.

 Const 1963, art 1, § 1 states: “All political power is inherent in the people. Government is instituted for their equal benefit, security and protection.”

 There is a reason why the United States and Michigan Constitutions should be read differently; namely, “we, the people” of the State of Michigan created Michigan’s Constitution, and interpretations of this Constitution must reflect that will, and “we the people of the United States” created the United States Constitution, and interpretations of that Constitution must reflect that will. These are distinct constitutions and distinct citizenries, and this Court must independently analyze our state Constitution to ensure that our citizens are receiving the measure of the protections that they created, which protections may or may not extend beyond those set forth by the federal Constitution.

 While there might well be an informal presumption that a United States Supreme Court interpretation of a federal constitutional provision constitutes the proper interpretation of a similar or identical state constitutional provision, this Court need not apply that presumption, and it need not defer to an interpretation of the United States Supreme Court, unless we are persuaded that such an interpretation is also most faithful to the state constitutional provision. This Court has on occasion seemed to suggest that there is some specific burden on this Court to identify a “compelling reason” or justification for interpreting the words of the Michigan Constitution differently than the words of the United States Constitution. See, e.g., People v Nash, 418 Mich 196, 214-215; 341 NW2d 439 (1983) (“We have, on occasion, construed the Michigan Constitution in a manner which results in greater rights than those given by the federal constitution, and where there is compelling reason, we will undoubtedly do so again.”) (citations omitted); People v Collins, 438 Mich 8, 25; 475 NW2d 684 (1991) (“[A]rt 1, § 11 is to be construed to provide the same protection as that secured by the Fourth Amendment, absent ‘compelling reason’ to impose a different interpretation.”) (citations omitted). However, this cannot precisely describe this Court’s relationship with the federal judiciary, even with the United States Supreme Court. While it may almost always be prudent and responsible for this Court to examine federal precedents when they pertain to the same or similar language as in the Michigan Constitution, our responsibility in giving meaning to the Michigan Constitution must invariably focus upon its particular language and history, and the specific intentions of its ratifiers, and not those of the federal Constitution. Simply put, our *223 exercise of judgment concerning the reasonable meaning of the provisions of our state Constitution cannot, consistently with our oath of office and our structure of constitutional federalism, he delegated to another judicial body.

 This Court has referred to various factors that may he relevant in determining whether Michigan’s Constitution supports an interpretation that differs from that of the United States Constitution:
1) the textual language of the state constitution, 2) significant textual differences between parallel provisions of the two constitutions, 3) state constitutional and common-law history, 4) state law preexisting adoption of the relevant constitutional provision, 5) structural differences between the state and federal constitutions, and 6) matters of peculiar state or local interest. [Collins, 438 Mich at 31 n 39, citing People v Catania, 427 Mich 447, 466 n 12; 398 NW2d 343 (1986).]
We continue to believe that the application of these factors will often prove helpful to this Court in the interpretation of particular state constitutional provisions. However, we also believe that examination of these factors collectively supports the conclusion that the ultimate task facing this Court in cases requiring interpretation of particular Michigan constitutional provisions is to respectfully consider federal interpretations of identical or similar federal constitutional provisions, but then to undertake by traditional interpretive methods to independently ascertain the meaning of the Michigan Constitution.

 Michigan’s Constitution of 1835 did not contain a self-incrimination provision; however, the current provision was incorporated shortly thereafter in 1850. Const 1850, art 6, § 32. This provision remained unchanged in Article 2, § 16 of Michigan’s Constitution of 1908 and in Article 1, § 17 of Michigan’s Constitution of 1963. In 1963, Article 1, § 17 was amended to add “the right of all individuals, firms, corporations and voluntary associations to fair and just treatment in the course of legislative and executive investigations and hearings shall not be infringed,” but the self-incrimination part of the provision remained unchanged. Thus, the language of the Michigan Constitution’s self-incrimination provision has remained consistent since its incorporation in 1850.

 We need not decide whether our interpretation of “compel” for purposes of Article 1, § 17 is fully in accord with Miranda’s interpretation *226 of the same term for purposes of the Fifth Amendment, given that Miranda has established an irreducible minimum standard for purposes of all custodial interrogations in Michigan, as well as those in every other state. Further, such a comparison would be irrelevant to our assessment of Bender, as Bender’s interpretation of “compel” goes beyond its meaning as contemplated by either Article 1, § 17 or Miranda. Pursuant to Bender, a suspect’s voluntary Miranda waiver, made with full knowledge of his Miranda rights, can nonetheless be considered “compelled” for purposes of Article 1, § 17, and therefore invalid, solely because that suspect was not informed of an attorney’s efforts to contact the suspect. Accordingly, Bender renders incriminating statements or confessions inadmissible by finding “compulsion” when there existed no form of the coercion, violence, force, or pressure contemplated by either the text of Article 1, § 17, or by the United States Supreme Court in its analysis of what it viewed as more subtle and nuanced forms of coercion in Miranda.

 Indeed, constitutional conventions, as a distinctive form of “super legislative history,” deriving from the source of authority of the constitution itself, “we, the people,” may be highly valuable in interpreting constitutional provisions:
“[T]he constitutional convention is a distinctively American contribution to political theory and action .... [I]t is the personification of the sovereign people assembled for the discharge of the solemn duty of framing their fundamental law.” [Schlam, State Constitutional Amending, Independent Interpretation, & Political Culture, 43 DePaul L Rev 269, 320 n 148 (1994), quoting Walker, Myth & Reality in State Constitutional Development, in Major Problems in State Constitutional Revision (Graves, ed, 1960), p 15 (alterations in original).]

 For example, in People v Nash, this Court concluded that it should interpret Michigan’s Constitution differently than the United States Supreme Court’s interpretation of the Fourth Amendment, in part because the records of the Michigan Constitutional Convention of 1961 indicated that the addition of an anti-exclusionary-rule provision was made in a particularly aggressive attempt by the delegates to assert state sovereignty in reaction to the United States Supreme Court decision in Mapp v Ohio, 367 US 643; 81 S Ct 1684; 6 L Ed 2d 1081 (1961). Nash, 418 Mich at 211-213.

 There are two distinct “voluntariness” inquiries that must he considered in analyzing the admissibility of an incriminating statement or confession. First, the incriminating statement or confession itself must have been made voluntarily. Second, a suspect’s Miranda waiver must have been made voluntarily These distinct concepts of “voluntariness” must be borne in mind in assessing both Bender and Moran.

 Justice Cavanagh’s dissent misapprehends this point by stating “the majority argues that Cavanaugh cannot support Bender because Cavanaugh employed a ‘totality of the circumstances’ rule rather than the per se rule applied in Bender. The fact that Cavanaugh and Bender differed on what test should result from police interference with counsel’s efforts to speak to a suspect does not lessen the fact that both Cavanaugh and Bender agreed that such police conduct is unconstitutional under the Michigan Constitution.” Post at 267-268. However, our point is not that Cavanaugh’s application of a totality of the circumstances test instead of a per se rule is fatal to Bender, but is instead that by concluding that the police’s refusal to allow the attorney to see the defendant was only one factor among many that might have rendered the defendant’s confession involuntary, Cavanaugh nowhere concluded that such failure alone would render a confession inadmissible. In other words, because this Court concluded that the jury should hear a host of factors to determine whether the defendant’s confession was voluntary, a single factor — that counsel’s requests to speak to the defendant were refused — cannot he identified and cited for the proposition that Cavanaugh established as a matter of constitutional principle that a defendant must be informed of an attorney’s attempts to contact him in order for his subsequent confession to be admissible.

 Similarly, in the ease at hand, defendant failed to request an attorney after reinitiating contact with police and before waiving his Miranda rights and making an incriminating statement, despite the fact that defendant knew he could request an attorney, as he had done so the day before.

 It should be noted that, were the circumstances in Cavanaugh to arise today, the confession would be inadmissible, as the officers ignored the defendant’s assertion of his right to counsel and continued to interrogate him, contrary to Miranda, 384 US at 473-474.

 Despite this, Bender’s lead opinion stated that “[i]n Wright, this Court held that the Michigan Constitution imposes a stricter requirement for a valid waiver of the rights to remain silent and to counsel than imposed by the federal constitution.” Bender, 452 Mich at 611 (opinion by Cavanagh, J.).

 Justice CAVANAGH’s dissent alleges that Cavanaugh provided specific support for Bender, as the justices in support of Bender “necessarily relied on Cavanaugh (as evidenced by the Bender opinion’s citations to the Wright opinions, which cited Cavanaugh) as the primary source for the broader interpretation of the right against self-incrimination under the Michigan Constitution.” Post at 274. However, Bender did not once cite Cavanaugh, and although several opinions in Wright did cite Cavanaugh, none cited it for the proposition that Michigan’s right against compulsory self-incrimination affords greater protections than those afforded by the Fifth Amendment. In Wright, Justice Mallett did not cite Cavanaugh in the lead opinion; Justice Cavanagh cited Cavanaugh in his concurrence in support of his belief that the police conduct in Wright violated defendant’s right to counsel under Article 1, § 20 and the due process provision now contained in Article 1, § 17, Wright, 441 Mich at 156-157 (opinion by Cavanagh, J.); Justice Brickley cited Cavanaugh in his concurrence for the proposition that incommunicado interrogation affects the voluntariness of a. Miranda waiver, id. at 168-169 (opinion by Brickley, J.); and Justice Riley cited Cavanaugh in her dissent to rebut the argument that Michigan’s Constitution requires officers to inform a defendant of an attorney’s presence for that defendant’s waiver to be made voluntarily and knowingly, id. at 178-180 (opinion by Riley, J.). Thus, this Court did not rely on Cavanaugh for the proposition that the compulsory self-incrimination provision contained in Article 1, § 17 provides protections that extend beyond those afforded by the Fifth Amendment.

 As we have indicated, we do not understand the assertions in Moser and Paramount as communicating that this Court, in carrying out its obligation to interpret Article 1, § 17, will forever adhere to all future interpretations of the Fifth Amendment hy the United States Supreme Court, but merely that, in our judgment, the framers of these constitu *240 tional provisions possessed similar intentions with regard to their purposes, and possibly also that until that time, judicial understandings of Article 1, § 17 and the Fifth Amendment were in general accord.

 In his dissent, Justice CAVANAGH asserts that our “hyper-textualist” definition of “compulsion” is inconsistent with Cavanaugh’s understanding of the term, as Cavanaugh recognized that “incommunicable” interrogation may render a confession involuntary, and such “incommu *242 nicable” interrogation is not the type of “coercion, violence, force, or pressure” contemplated by our definition. However, Cavanaugh did not hold that a confession made in an “incommunicable” environment is involuntary, which is what the dissent would seem to suggest. Cavanaugh instead acknowledged only that the incommunicable nature of a confession might be one factor, combined with a host of others — -including sleep deprivation, duress, and “brow-beating,” all factors that were traditionally considered in a voluntary analysis — that might potentially render a confession involuntary. This Court should not isolate a single factor from Cavanaugh in order to establish the meaning of “compulsion” or “voluntariness” in Michigan, in disregard of what Article 1, § 17, and the body of caselaw both preceding and succeeding Cavanaugh, would otherwise suggest.

 Notably, even Justice Brickley, writing for the majority in People v Hill, 429 Mich 382, 392-393; 415 NW2d 193 (1987), acknowledged that “[a]t the time of the drafting of our 1963 Constitution (pre-Miranda), the self-incrimination provision of the Fifth Amendment was only implicated when an extrajudicial statement was found to have been elicited involuntarily.”

 At oral argument, defense counsel acknowledged that Cavanaugh established a right to counsel as a condition of voluntariness, and that the Court could not have been contemplating a “knowing and intelligent” standard at that time. Specifically, he stated, “I don’t think really the courts had entertained as much beyond the voluntariness as came later on with Miranda — where it talks about voluntary, knowing, and intelligent. So as the law progressed, I think they weren’t really addressing knowing and intelligent.” Moreover, defendant has cited no caselaw apart from Cavanaugh that hints at either a “knowing” requirement, or a different “voluntariness” definition, than the one contemplated by Article 1, § 17.

 Going one step further, even assuming arguendo that Cavanaugh in some way did contemplate Miranda’s “knowing” prong, there is certainly *244 no indication that Cavanaugh further contemplated the additional and specific protections placed on this prong by Bender.

 Justice Cavanagh’s dissent alleges that the right to counsel articulated in Article 1, § 20 of Michigan’s Constitution, which states that, “[i]n every criminal prosecution, the accused shall have the right... to have *245 the assistance of counsel for his or her defense,” lends additional support for Bender. See post at 275-278. However, in Kirby v Illinois, 406 US 682, 688; 92 S Ct 1877; 32 L ED 2d 411 (1972), the United States Supreme Court held that the right to counsel attaches “only at or after the time that adversary judicial proceedings have been initiated against him.” Although this Court initially recognized that there may be instances in which the right to counsel attaches prior to formal charging in People v Anderson, 389 Mich 155; 205 NW2d 461 (1973), and People v Jackson, 391 Mich 323, 338; 217 NW2d 22 (1974), we expressly overruled Anderson and its progeny, including Jackson, to the extent they “go[] beyond the constitutional text and extend!] the right to counsel to a time before the initiation of adversarial criminal proceedings” in People v Hickman, 470 Mich 602, 603-604, 608-609; 684 NW2d 267 (2004), and reaffirmed that the right to counsel attaches at or after the initiation of adversarial judicial criminal proceedings. In both Bender, and the instant case, defendants waived their Miranda rights and made incriminating statements before charges were issued, and therefore before the initiation of adversarial judicial criminal proceedings, signifying that the right to counsel had not yet attached. While the dissent articulates its own belief that Anderson and Jackson were overruled in error, and that Kirby’s restriction is “arbitrary,” the majority of this Court did not agree and current law clearly indicates that the right to counsel had not yet attached at the time of defendant Bender and defendant Tanner’s Miranda waivers. Therefore, Article 1, § 20 also does not support Bender.

 See note 5 of this opinion.

 The United States Supreme Court has determined that, despite its initial “prophylactic” character, Miranda is now a “constitutional rule.” Dickerson, 530 US at 438-440, 444. However, this does not necessarily mean that Bender’s “prophylactic” rule is also constitutional in character. Although Miranda affords protections that seem to exceed the textual boundaries of the Fifth Amendment, the United States Supreme Court has emphasized that the point oí Miranda is to protect against the coercive nature of the custodial interrogation environment, which clearly does implicate the Fifth Amendment. However, because Bender is implicated even when a confession is altogether voluntary and non-coercive, and because Bender pertains to whether the Miranda waiver was knowing, and not to the voluntariness of the confession, it is hardly self-evident that Bender is “prophylactic” in the same way in upholding the Constitution as was Miranda. Because Bender invalidates confessions made absent any evidence of the type of coercive custodial interrogation *247 environment that motivated Miranda, Bender does not further Miranda’s purpose of dissipating the impact of this environment, or at the very least does so in a far more indirect and attenuated manner by, in the words of the Bender dissent, “creating] prophylactic rules to protect prophylactic rights.” Bender, 452 Mich at 644. Contrary to Justice Cavanagh’s dissent, we do not conclude that it is Bender’s “prophylactic” character that “deprives the [Bender] rule of constitutional status,” post at 269, hut rather the nature of the rule itself.

 The fact that counsel in this case was appointed, whereas counsel in Bender was retained, makes no difference to our analysis, or to Bender itself as far as we can see. In neither instance can an attorney’s unsuccessful efforts to contact a defendant affect the defendant’s ability to apprehend and voluntarily waive his Miranda rights.

 This case illustrates the problems with Bender. Defense counsel concedes that defendant’s waiver was made voluntarily, and there are no allegations that defendant did not understand the Miranda rights that he waived. Because defendant did not invoke his right to counsel after reinitiating discussion with the police and being advised of his Miranda rights a second time, and because the adversarial proceedings had not yet *249 begun, the prosecutor was not required to contact the court, and the court was not required to appoint an attorney for defendant. Had the prosecutor and court not been proactive in effecting the appointment of an attorney, Bender never would have been implicated, because there would have been no attorney of whose presence defendant needed to be informed. Instead, the prosecutor, on behalf of the people, was effectively sanctioned by the suppression of defendant’s voluntary statements for having taken the precaution of seeking out counsel in the event that defendant requested counsel before or during his interrogation.) Consequently, Bender has the effect of discouraging the type of initiative shown by the prosecutor, because police officers and prosecutors will almost certainly be more reluctant to facilitate counsel before one is legally required if the consequence is the suppression of evidence.

 Justice Cavanagh’s dissent emphasizes that a stare decisis analysis should begin with the presumption that upholding precedent is the *252 preferred course of action and that “when our caselaw concludes that the Michigan Constitution provides greater protection to our citizens than that provided by the federal Constitution,... ‘this Court should be required to show a compelling reason to depart from [that] past precedent.’ ” Post at 279 (alteration in original) (citation omitted). We agree that precedent should not be lightly overruled, and that a presumption should generally obtain in favor of upholding precedent, although we do not understand why particular precedents that have interpreted our Constitution in a manner different than similar language in the federal constitution should give rise to any special rule of stare decisis.

 In his dissent, Justice Cavanagh disagrees with the conclusion that Bender “impingets] on the effectiveness of law enforcement,” instead noting that “it does not appear that Michigan’s law enforcement has suffered from a serious inability to effectively enforce the law in the 18 years since Bender was decided.” Post at 283. However, as the prosecutor explained at oral argument, Bender violations frequently arise, and many of the negative effects of Bender are not obviously seen, but nonetheless exist, because “[b]y following Bender, confessions are never made so there’s never the motion to suppress ... or the case is never solved so charges are never filed.... [And] plea bargains are entered into that otherwise should not be, hut have to be because of a Bender issue.”